(No. 18933.—

The People of the State of Illinois, Defendant in Error, *vs.* William O'Hara *et al.*—(Carl Shelton *et al.* Plaintiffs in Error.)

*Opinion filed October 25, 1928—Rehearing denied Dec. 11, 1928.*

HAROLD J. BANDY, and EDMUND BURKE, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, CARL H. PREIHS, State's Attorney, and ROY D. JOHNSON, (JOHN E. HOGAN, HARRY B. HERSHEY, and WILLIAM S. GREER, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

On Saturday, September 27, 1924, three men armed with revolvers entered the Kincaid Trust and Savings Bank in Kincaid, in Christian county, about ten o'clock in the forenoon, for the purpose of robbing the bank. The bank building is a two-story white-brick-front building in the

middle of the town, on a paved street, fronting west and north. The pay-roll of the Peabody Coal Company, amounting to about $60,000, was in the safe and about $7784.64 was on the counter. Ira Aull, assistant cashier of the bank, Bruce Shaw, president, Lyndall Wells and Maude Quinn, employees, were in the bank, in charge. Shaw, who was at the front desk checking over the notes, picked up the note case and walked into the vault. One man who was at the window told him not to close the door, but he closed it and began shooting. The man fired back, and after firing all his shots Shaw closed the door and pushed the burglar alarm. Aull was sitting at the back desk when a large man weighing 200 pounds, about six feet tall, ordered the employees to hold up their hands. Aull did so and was placed with his face to the wall. Some shots were fired in front of the bank, and the man went there, then came back, put his revolver against Aull's back, ordered him to get the pay-roll and pushed him toward the vault. Shaw was in the vault and another man was shooting at it. Aull pushed the door open and Shaw let him in. Aull was told to open the safe but could not do so because the time-lock was on. Shaw was taken into the back part of the bank and hammered over the head with a revolver and told not to look at his assailant. Aull was told to take the money from the counter and put it in a satchel, and did so, putting in $7784.64 in currency, silver and other items. When the men got ready to go they took Aull with them, marching him through the front part of the bank to a car parked about a hundred feet from the bank. He was told to get in the car and hold his head down on his knees. He thought there were six in the car. There was much shooting, but none of the men in the car were shooting at that time though they fired some shots as they went down the street. One of the occupants of the car had a wound in his leg and Aull gave him his handkerchief to stop the bleeding. The men drove through the town a mile south,

turned west, and then the car was stopped and Aull was told to get out, climb a fence into a field and lie down, and he did so. This was about a mile and a half from the bank, and these events occupied about ten minutes from the time the robbers entered the bank until they let Aull out of the car.

On August 29, 1927, at the August term of the circuit court of Christian county the grand jury returned an indictment charging William O'Hara, alias Billy O'Hara, alias Billy O'Hare; William Diedicker, alias Bill Diedicker, alias Bill Deeichker; Paul Blackburn, alias Blacky; Edward Mitchell, alias Eddie Mitchell, alias Eddie Nicholson; Carl Shelton, Earl Shelton and Bernie Shelton, in three counts, with the crime of robbery. The three Sheltons and Nicholson were arrested and the Sheltons gave bail for their appearance. At the November term, on January 3, 1928, the three Sheltons entered a motion to quash the indictment, which was overruled, Nicholson's motion for a severance was allowed, the Sheltons were placed on trial, and on January 7 a verdict was rendered finding them guilty of robbery in manner and form as charged in the indictment. Motions for a new trial and in arrest of judgment were overruled, they were sentenced to imprisonment in the penitentiary and have sued out a writ of error.

It is contended that the motion to quash the indictment should have been sustained because it failed to charge the defendants with the crime of robbery or any crime, neither count of the indictment charging that the defendants took the money from the person or in the presence and under the immediate control and possession of the persons alleged to have been assaulted or either or any of them. The first count charged that the defendants, being each armed with a loaded revolver, made an assault upon Bruce Shaw, Ira Aull, Lyndall Wells and Maude Quinn and by force and intimidation put them in bodily fear and danger of their lives, and "from the personal possession, custody and

control of the said Bruce Shaw, Ira Aull, Lyndall Wells and Maude Quinn then and there feloniously, forcibly, violently and by intimidation did rob, steal, take and carry away" the property described in the count, "of the money, funds and property of the Kincaid Trust and Savings Bank, a banking corporation." The other two counts were substantially the same. The objection made is that this language does not allege directly, positively or with any degree of certainty that the money was taken either from the person or from the presence and immediate control and possession of the persons assaulted.

The Criminal Code defines robbery as "the felonious and violent taking of money, goods or other valuable thing, from the person of another by force or intimidation." At common law robbery is defined as "the felonious and violent taking of any money or goods from the person of another, putting him in fear, be the value thereof above or under one shilling." (1 Hale's P. C. 532.) But if property was taken feloniously, with force and violence or by putting in fear, in the presence of the owner, it was in legal contemplation a taking from his person. (1 Hale's P. C. 532; *Rex* v. *Francis,* 2 Strange, 1015.) "And so it is whether the taking be strictly from the person of another or in his presence only, as where a robber by menaces and violence puts a man in fear and drives away his sheep or his cattle before his face." (4 Blackstone's Com. 243.) The words "from the person of another," as used in our statute, have the same meaning with which they were used at common law, and robbery may be committed by violence or putting in fear and feloniously taking money or other property from the person or in the presence or under the immediate control and possession of the person assaulted. (*O'Donnell* v. *People,* 224 Ill. 218; *People* v. *Funk,* 325 id. 57.) In *State* v. *Calhoun,* 72 Iowa, 432, the accused entered a dwelling house and with threats and violence extorted information from one of the occupants, and then, leaving

her tied in one room, went into another and took a watch and money, and he was held guilty of robbery, the taking being in her presence. In *Clements* v. *State,* 84 Ga. 660, a person was detained by threats and intimidation in a smoke-house detached from his dwelling while the dwelling was entered and property there was stolen, and the crime was held to be robbery, the property being in the immediate possession and control of the owner. Train robbers driving an express messenger out of his car and then blowing open the safe and taking the money were held guilty of robbery. (*State* v. *Kennedy,* 154 Mo. 268.) Here the allegation of the taking from the personal possession, custody and control requires proof of the possession by the individuals named, in person, without the intervention of another, and this was sufficient.

It is argued that the second and third counts are ambiguous and uncertain and that the charge intended may be burglary or robbery, since each of these two counts charges the defendants with entering the bank building of the Kincaid Trust and Savings Bank. These counts do not charge burglary. They do not allege a forcible breaking and entry or entry without force or the intent with which the entry was made. The motion to quash was properly overruled.

When the indictment was returned the names of the following witnesses were indorsed on it: Lyndall Wells, S. S. Stone, Hugh Thomas, Albert Matozzo, L. A. Ryan, Ira Aull, Henry Clerick and Art Newman. After the motion to quash the indictment was overruled the defendants made a motion for a rule on the prosecution to endorse on the indictment the names of all witnesses to be used on the trial of the case and to advise the defendants what they expected to prove by such witnesses. The motion was denied and the defendants were arraigned and pleaded not guilty. The defendants then again moved the court to require the prosecution to endorse the names of all witnesses on the indictment, the motion was denied, and a motion to

require the prosecution to furnish a bill of particulars was denied. The defendants then entered a motion for a continuance, supported by their affidavits and the affidavit of William Lynn. The affidavits of the defendants set forth that they were not ready for trial on account of the absence of Roy Baker, Howard Lee and Leo Dougherty, who were material witnesses for them in their defense; that the absence of such witnesses has not been caused by any lack of diligence on the part of the defendants, but that they did not receive notice that the case was set for trial until December 29, 1927, and that their attorneys did not receive such notice until December 28, 1927; that neither the defendants nor their attorneys were furnished with a copy of the indictment until December 28, 1927, and that until that time the defendants did not know what the charges were or the date when they were alleged to have committed the offense, nor the names of the witnesses endorsed on the indictment, and that neither they nor their attorneys knew any of those facts until December 28, 1927; that they are not guilty of the offense charged in the indictment or any count thereof, and that they were not in Kincaid on September 27, 1924, or at any time, but that on that date, and all during that month, they were continuously in East St. Louis, Illinois; that aside from their own testimony they know of no other person by whom they can prove this fact than Roy Baker, who resides at Eighth and Summit streets, Howard Lee, who resides at the Southern Hotel, and Leo Dougherty, who resides at No. 256 North Tenth street, all in the city of East St. Louis; that each of them knows that the defendants on September 27, 1924, were not in the city or village of Kincaid or in Christian county and that the defendants were continuously in the city of East St. Louis, so far removed from Kincaid that they could not have participated in the robbery of the Kincaid Trust and Savings Bank; that said persons were continuously associated with the defendants during the month of September,

1924, and if present in court would testify that the defendants were not in Kincaid and were not in Christian county on September 27, 1924, and that said testimony would be true; that one of the attorneys for the defendants telegraphed the circuit clerk of Christian county for subpœnas on December 29, 1927, and on December 30, 1927, received them and placed them in the hands of William Lynn, a constable, for service on the persons named; that necessary transportation money was furnished; that the officer diligently endeavored to serve the subpœnas but was unable to locate the witnesses and the subpœnas were returned not found; that the addresses given in the affidavit are and will continue to be the permanent addresses of the witnesses; that diligent inquiry among the friends, relatives and acquaintances of the witnesses shows that they are temporarily away from East St. Louis over the Christmas and New Year holidays but that each of them will return to East St. Louis within a short time, probably within a few days; that if this case is continued said witnesses will be present in court to testify for the defendants; that each of them would testify, if present, that the defendants were in the city of East St. Louis on the 27th day of September, 1924, the entire day, were not outside the city, and were not at Kincaid or in the county of Christian on that day or at the Kincaid Trust and Savings Bank, and were associated continuously with them during the entire month of September, 1924, including the 27th day; that said witnesses are ready and willing to appear as witnesses and have so informed the defendants, and that they will appear if the case is continued and set for a date when they can be subpœnaed and notified to be present, and the defendants know of no other persons by whom these facts can be proved; that they are not guilty and their only defense is an alibi; that the defendants will be greatly prejudiced if they are required to be tried at this time and will be denied the right to a fair and impartial

trial; that they have diligently endeavored to make ready for trial at this date and that their failure to be ready has not been caused by any lack of diligence or negligence on their part, and that this application is not made for delay but that justice may be done. The affidavit of William Lynn stated that the subpœnas for the above named witnesses were delivered to him for service on December 30, 1927, together with the necessary funds for transportation to be advanced the witnesses, and that he diligently attempted to locate the witnesses and was unable to find them and was compelled to return the subpœnas not found.

The motion for a continuance was denied, and thereupon the plaintiffs in error renewed their motion that the prosecution be required to endorse the names of the witnesses on the indictment, stating that they were informed during the noon intermission that the prosecution had in the custody of officers two convicts named Fred Wooten and Hobart Summers, and they asked that the prosecution be required to show what they expected to prove by them. The State's attorney then dictated to the reporter a statement of what he expected to prove by Summers, and asked leave to endorse also the names of Mr. and Mrs. Fred Reiske, who had knowledge of the fact that Carl Shelton was shot at the time of the commission of the Kincaid robbery and would testify to the facts and circumstances in connection with that occurrence. They also asked leave to endorse the name of Mrs. Sophia Bender, of Kincaid, who would identify the defendants as participants in the robbery, and the name of Mrs. Maude Quinn Powell, formerly Maude Quinn, who would testify that she was a witness to the robbery and would identify the Sheltons as being some of the persons who were there that day. The names of these witnesses were endorsed on the indictment, and the defendants then made a supplemental motion for a continuance, which was denied. The jury was then impaneled, the examination of jurors begun and a special venire was ordered for thirty

jurors, returnable at nine o'clock the next morning, January 4. On January 4 the jury was selected and sworn and the State's attorney made his opening statement. After doing so he asked leave to endorse on the indictment the names of Tom Nave, Rose Clemans and Mary Davidson, stating that he expected to prove by Nave that on the morning of September 27, 1924, he was working in his field, south of Kincaid, and at that time he saw a Cadillac touring car going south from Kincaid and saw several persons in that touring car and saw Ira Aull get out of the touring car; that he would be able to recognize and identify one of the defendants; that Rose Clemans and Mary Davidson were residents of Kincaid and were living there on September 27, 1924, and saw the three Sheltons there in Kincaid on the morning of that day. The defendants objected to the endorsement of the names, but their objection was overruled and the trial proceeded, Nave being the first witness examined. The next witness called was Leonard Ising, and objection was made to him on the ground that his name had not been furnished the defendants and was not on the indictment. Thereupon the State's attorney asked leave to endorse the names of Leonard Ising, Robert J. Borland, Martin Schnepper, Thomas J. Sullivan and R. L. Lawrence, the State's attorney stating that the first four would testify as to the finding of the stolen green Cadillac car at or near Mascoutah, Illinois, on or about September 29, 1924, which the People contend was the car used in the robbery, and Lawrence would testify that he saw this green Cadillac car used in the robbery.

The plaintiffs in error contend that the court abused its discretion in denying their motion for a continuance and in permitting the names of the additional witnesses to be endorsed on the indictment, and in allowing them to testify, over objection, without giving the plaintiffs in error an opportunity to prepare to meet their testimony. So far as the motion for a continuance was based on the lack of time for

the preparation of their defense it was without merit, because the defendants entered into recognizance and were admitted to bail on September 29, the next term of court began on November 28, and the case was not called for trial until January 3, 1928. During this period of three months the defendants were at liberty and free to ascertain the charge against them and prepare their defense. The requirement of the statute that every defendant charged with a felony shall be furnished, before his arraignment, a copy of the indictment and a list of jurors and witnesses is directory, only, and in order to make the omission to comply with this requirement available on error the defendant must demand a copy of the indictment and a list of witnesses and preserve the evidence of such demand in a bill of exceptions. (*People* v. *Pennington,* 267 Ill. 45.) The defendants knew their case would be called for trial at the term beginning November 28, and it was incumbent on them to prepare for trial and to ascertain and know when the court set the case for trial. For all that appears in the record, by affidavit or otherwise, the court may have set the case on the first day of the term for trial on January 3, 1928. If this was done the defendants should have had subpoenas issued for their witnesses before December 29. The affidavit does not state at what time the witnesses left East St. Louis or whether they were within the State of Illinois or not, and fails to make any showing that if subpoenas had been issued as soon as the case was set for trial, or within a reasonable time thereafter, they would not have been served in time for the witnesses to be present and testify at the trial. It was not error to overrule the motion for a continuance.

Neither was it error to permit the endorsement on the indictment of names of witnesses which were not on the indictment when the defendants were arraigned and of which they had no notice. The People are not restricted to the witnesses on whose testimony the indictment is re-

turned, whose names are required to be endorsed on the indictment to be furnished the defendant before arraignment, but the circuit court, in the exercise of a sound discretion and having a strict and impartial regard to the rights of the community and the prisoner, may permit such other witnesses to be examined as the justice of the case may seem to require. (*Gardner* v. *People,* 3 Scam. 83; *Gates* v. *People,* 14 Ill. 433.) The examination of such witnesses is within the sound discretion of the court, for the exercise of which it has been said error cannot be assigned. *Bulliner* v. *People,* 95 Ill. 394; *Gore* v. *People,* 162 id. 259; *People* v. *Curran,* 286 id. 302; *People* v. *Bundy,* 295 id. 322.

Shaw and Aull testified as to what occurred in the bank at the time of the robbery, as has been already stated. Neither of them identified or was asked to identify any of the defendants. By the testimony of other witnesses it was shown that after the men entered the bank and had compelled the persons then in charge of the funds to surrender them the robbers left the bank, taking with them the satchel containing the money thrown into it by Aull. Shooting was then going on in the streets near the bank between the robbers and citizens who had learned of the robbery. A car which is described by some of the witnesses as a big open car of a dark color, and by others as green with a white stripe around it, drove by from the east. A man who had a sawed-off shotgun got out of the car and began shooting. The car moved around the bank corner and started south and some men came out of the bank and got into the car, while one man who carried the valise in his hand got in the car from the other side. He tried to throw this valise into the car but hit the running-board, which knocked it out of his hand. The men in the car got him by the hand and pulled him on the running-board and went about seventy-five feet, when the man started back after the valise, but the men in the car called him back, telling him to let the valise go. He went back and left the

valise, which was recovered and turned over to the bank. It had money in it. The car, with the robbers and Aull in it, then proceeded through the town and south and west until stopped, as described by Aull, when he was told to get out and lie down in the field. These were the circumstances attending the robbery. The whole occurrence occupied but a few minutes. There is no dispute about it. The only question contested on the trial was the identity of the defendants. The testimony of the witnesses on this question was rather vague and uncertain. They were Henry Clerick, R. L. Lawrence, Clyde Houser, Albert Matozzo and Sudonna Bender.

Henry Clerick, in response to the question whether he could describe any of the men that he saw, said: "Well, that would be pretty hard to do after two years; it is pretty hard to identify a man, but I think—." Objection was made and overruled, and counsel told the witness to give his best recollection or judgment as to whether any of these men were the men whom he saw there on that occasion, and his answer was, "I think it was the first gentleman, here, behind." (Indicating Carl Shelton.) On cross-examination he said he was pretty busy shooting and everybody else was doing the same thing. He saw the one man that was calling the other men to come out of the bank. He was south of the bank, on the sidewalk. He saw a few of them run out of the bank after he called, then the car went on. He couldn't tell how many were in the car. He has never seen any of the men from that day until now. He didn't know any of them. There was no one that he had ever seen before.

R. L. Lawrence, who was a young man eighteen years old and had lived in Kincaid six years, attending the high school in Pana, testified that at the time of the robbery he was standing in front of the Kincaid theater, and he rushed into the store and stayed while his father went out. He was told if the car passed that way to get the license num-

ber, and he got out in front of the store. A car was coming about five miles an hour and a man walking backward behind it with a rifle was guarding the bank. It was a green car and had a white stripe around it. It was about thirty-five feet away when it went by him. He saw about five men in the car. They seemed all to have caps on. The driver had a cap on, and when he turned around to see if the man was guarding the bank the witness got a good look at him. He had a dark complexion and heavy eyelashes. The witness was on the left side, and in his judgment the man who was driving the car was one of the defendants who was wearing a light suit at the trial. He said he would not say for sure, but he had heavy eyelashes and had on a light suit—indicating the defendant Bernie Shelton.

Clyde Houser was working in a hardware store 200 feet east of the bank when he heard that the bank was being robbed. He went out in front and saw a large-sized man shooting toward the hardware store. He was asked to look at the three defendants and tell the jury whether or not in his judgment either of the men was the man he saw there. He answered, "Yes," and being asked to point out the man he saw there, he said, "The one at the west end of the table." (Indicating Earl Shelton.) To the question, "You mean the one with the gray suit?" he answered, "Yes, sir." On cross-examination he said that he never saw any of the men who committed the robbery before the robbery, but that he had picked out the picture of one of them once in Pana, where a detective had it.

Albert Matozzo was engaged in the grocery business, about half a block south of the bank. He heard there was a fight at the bank and went about seventy-five feet north of his store with a pistol in his hand, when a man with long hair and a dark complexion, about six feet tall and weighing about 200 pounds, came out of the bank and said, "Get out of there!" and Matozzo started to run. He went into the hardware store, and when he got to the doorway

a man standing at the northeast corner of the bank shot at him six times, using a blue-steel revolver. He was a slim man, about six feet tall, with a dark complexion and weighing about 165 pounds. He and Matozzo exchanged shots, firing several times, and then a man came out of the bank carrying a satchel and said, "Come on, Bill; to hell with the money." The witness saw five or six men, and one man with his hands up, whom he did not recognize but afterward learned to be Aull. He took one more shot and hit the man with the bag low down in the right leg and he dropped the bag. This man also had a dark complexion and would weigh 160 pounds or over. After he dropped the bag he got on the car, somebody pulled him in, and then the car began to drive slowly south. After it began to move, Matozzo, running alongside the bank building, saw a man running and shot him, and he dropped a sawed-off shotgun. Matozzo identified the shotgun and said Henry Clerick picked it up, but he did not identify any of the defendants and was not asked to. On cross-examination the following questions were asked and answered:

Q. "Do you know who the man was you shot in the leg?

A. "I can't recognize him, because I was not so close to him—about seventy-five or eighty feet.

Q. "Can you see in this court room the man you shot?

A. "I can't say it was the man exactly, but the description is of that man in the front there. (Indicating Carl Shelton.)

Q. "Standing up there? Is that the man you shot in the leg?

A. "I could not say for sure.

Q. "What is your judgment?

A. "The man looked just like him."

Sudonna Bender testified that she kept a restaurant across the street from the bank. When she heard the shooting she ran outdoors. When she was standing there the

car came along, and the men commenced shooting at her and she had to go in. Her examination continued:

Q. "I call your attention to the three men sitting here— the man in front and the man in the center and this one. You may observe them and tell the jury what particular man you saw out there on that occasion.

A. "That man with the tie looks like the one who told me to get in.

Q. "Which one?

A. "The man with the tie; if they would stand up I could tell better.

Mr. Bandy: "Who do you want to stand up?

Mr. Hershey: "All of them. (The three defendants stand up and walk over in front of the witness.)

Q. "Which man do you have reference to as standing on the corner?

A. "Well, I could not swear, but it seems to me that I saw all of them down south before.

Q. "Where do you mean?

A. "I don't want to make a mistake, but the two—

Q. "Which ones did you see out at Kincaid, if any? (Objection; overruled; exception.)

A. "Well, I want to make sure.

Q. "Which one, now, if any, did you see out there at Kincaid?

A. "The first one, I said, and that one over there.

Q. "Which one is the first one?

A. "The far one and the one in the center; I would not swear, but it looked like that man.

Q. "And which other man was it you say now?

A. "That one. (Indicating.)

Q. "The one on the end, in the light suit?

A. "Yes, sir; it looked like them; it was the same built men.

Q. "Between that time and your present testimony here did you see the picture of any of these men?

A. "Yes, sir; in the Springfield paper.

Q. "When was that?

A. "Last winter some time.

Q. "You know whose picture it was?

A. "Well, it seems to me it was the fleshy one, with the tie.

Q. "Do you know in what connection it was that you saw that picture?

A. "Bank robbery."

On cross-examination Mrs. Bender said: "It is hard to swear unless you are talking to someone, but I never saw anyone that looked so much like them as these boys."

This is all the testimony of any of the witnesses to the events occurring in Kincaid which has any tendency to show the presence of the defendants or their participation in the robbery.

Thomas Nave testified that he is a farmer who had lived in South Fork township twenty years and on September 27, 1924, was at his farm home a mile and a half south and three-quarters of a mile west of Kincaid. Between ten and eleven o'clock he heard a car come roaring down the road and started to the road to see what it was. He saw a large Cadillac touring car of a light-green color, with a stripe around the body, with five men in it, which passed his house. To the request to look at the defendants and tell the jury if he saw any of them there that morning he answered, "If I ain't mistaken I saw that man over there at the wheel." (Indicating Bernie Shelton.) He was forty or fifty feet from the car that went by.

Art Newman, who was confined in the Southern Illinois penitentiary serving a life term for murder, testified that in 1924 he was the proprietor of the Arlington Hotel, in East St. Louis; that his relations with the three Sheltons were very friendly and at times they stopped at his hotel. In August, 1924, Earl Shelton told him that they were going to rob the Kincaid bank, and later he talked with all

three of them at the hotel. The day they fixed to go up there was the day before the robbery. They talked about it in the middle of September and Carl Shelton asked Newman to drive them to Kincaid, but he refused to drive them to Kincaid on the robbery, and Carl then asked him to drive them to Taylorville, and said he would fix it with someone to meet him there. Carl and Earl and Bernie were present but Carl always did most of the talking. Newman told him he would not drive them on the job. The night before the robbery the Sheltons and Charlie Briggs were at the hotel and Newman had agreed to take them to Taylorville. They said they would be ready to go about four o'clock in the morning and would come down and wake Newman up to drive them to Taylorville. They left about four o'clock, Newman driving and the other four with him. When they came to the square in Taylorville he saw a couple of men in a car across the street, and Carl said, "There they are; they are waiting on us," and Newman let the others out and they walked across the street and Newman went on. The car looked like a Cadillac or a Lincoln. It was a greenish car. When they came up they had hats on, but they had caps with them, which they kept in their pockets. Afterward Newman talked with Carl, and Carl told him Earl got shot in the leg and got a pretty bad wound. That conversation was at the hotel. When Newman left Taylorville he went to Litchfield, on through Gillespie to East St. Louis. On the way up Carl asked him to wait on him at Litchfield. He wanted to transfer the pay-roll, if they made it, to Newman's car and have it taken down with Newman, saying, "Art, they will not be suspicious of you; will not search your car or have any suspicion of you; you are in business," but Newman refused. Afterward Carl said they ran into a pretty hot spot out there; that Earl got shot in the leg, and what little money they did pick up from the teller's window they had to drop. Newman talked with all three

of them about the robbery, and Earl had a cane and was limping.

When the Sheltons first came to East St. Louis, Bernie and Earl made their home at Newman's hotel and Carl lived across the river. Newman was pretty friendly with them and saw them often. In the summer of 1924 Newman owned a shotgun with a long barrel. He got it from a man named Slim Farmer, who used to be on the prohibition force and left the gun for $10 with Newman, who sawed the barrel off with a hack-saw. There was an air-cooler on the gun, and in cutting it off Newman got it crooked. He took a file and tried to file it smooth but could not do it. He let Carl Shelton have the gun. The gun which was introduced in the trial as the one dropped in the street in Kincaid at the time of the robbery was identified by Newman as the gun he let Carl have.

Hobart Summers, who was also confined in the penitentiary serving a term for robbery, testified that he had known the Sheltons six or seven years in East St. Louis, where he and they were living, but was not on very intimate terms with them, though he was engaged with them in the whisky business and robbery part of the time. He had conversations with all of them about the robbery prior to its occurrence. First, in June, Carl approached him on the question of driving the machine. Summers said that he was not open to all kinds of engagements. Carl explained to him that they had already looked over the territory and the roads. Later he talked with Carl and agreed to drive the machine. He went to Kincaid in July, 1924, with the three Sheltons and looked over the roads and the situation of the town. The time for the robbery was fixed for the 27th of August, but Summers, who had been in the penitentiary and was on parole, was on August 17 returned to Chester for violation of his parole, where he remained until December 2, 1926. After he got out he saw Carl and talked with him about the Kincaid bank robbery.

Fred Reiske testified that he lived at Horse Shoe Lake, about three miles from Granite City, and fished and built boats. In the latter part of September, 1924, a man whom he had seen before was brought to his house in a Ford and stayed there, and some person came there who said he was a doctor, who said he would have to use a bandage, that he was hurt, and he took him along with him. He was asked to look over the defendants sitting there and tell the jury if any one of the three was the man who came there. He answered, "I think the center one is the man." (Indicating the defendant Earl Shelton.) Whether the others were there or not he did not know. He thought the man stayed not over six hours before the man came who said he was a doctor. This man had a little satchel and Reiske supposed he was a doctor. Another man came there with the man who said he was wounded, then went away and afterward the doctor came, but the man who came with the wounded man did not come back with the doctor. They gave no names to him.

The defendants offered W. R. Meredith, who testified that he was a gunsmith, was familiar with fire-arms and had experience in shortening gun barrels. He stated that in his judgment the shotgun offered in evidence by the prosecution never had the barrel sawed off by a hack-saw; that the muzzle looked very much like it was cut in a factory. In the factory they have a tool that rounds in perfectly inside, and when it has been rounded out inside with a hand tool it always shows the effect of the hand tool. He said he was familiar with what gunsmiths call a "factory finish" on the muzzles of shotguns, and this looked like a factory finish. In rebuttal, Robert J. Borland, a police officer of St. Louis, with much experience and knowledge of such weapons, stated that the gun was sawed off after it left the factory, giving the reasons for his opinion. The gun had been made for the United States army, having a place

fixed for a bayonet. Such a gun originally has a place for a sight, but the place for the sight of this gun was gone.

The defense was an alibi. Carl Shelton testified that he was in East St. Louis on the day of the robbery and that Bernie and Earl were in jail on that day. The police blotter showed that Bernie and Earl were under arrest on September 27, 1924. It is a public record of arrests and was open for anyone to see at any time if there was a police officer present. It was not kept under lock and key, and anyone who wanted to see a police record could get permission from a police officer or desk sergeant. The last five names on the page were not in the handwriting of Boyle, the desk sergeant.

Three police officers testified that Bernie and Earl Shelton were confined in the police station on September 27, 1924. R. C. Cashel, one of them, testified that he was a patrolman and on that morning saw Earl and Bernie in the East St. Louis police station at nine o'clock, after roll call. That was the first time he ever saw them. One of the desk sergeants told him they pinched two bootleggers, and he went to see who they were. He remembered the date because he had bought an automobile in June on which he was required to make monthly payments. He did so for three months and then missed, and they sent a man up to his house and told him that if he did not pay the automobile would be taken away, so he borrowed the money from his brother and paid it, and that is why he remembered the date.

F. Combs, who had been continuously a member of the police department for fourteen years except while he was in the army, testified that in September, 1924, he was working at night; that about three o'clock in the morning of September 27 he came into the police station and one of the members of the police department told him they had two of the Shelton brothers in. He knew Carl Shelton and went back and looked at the brothers and saw it was Bernie

and Earl. He had a conversation with Carl concerning the two brothers being in jail at that time.

Thomas F. O'Brien, a lieutenant of police, testified that Earl and Bernie Shelton were at the police station on the morning of September 27, 1924. O'Brien was at the switchboard at that time and was standing at the door of the operator's room when they were brought in. He did not know them personally when they came in. He heard who they were and saw them after that date. He did not see the blotter at that time but knew they were booked and saw the sergeant get their names.

J. M. Fisher testified that he was a professional wrestler and held the title of light-weight champion of the world, and that on the morning of September 27, 1924, he talked with Carl Shelton in East St. Louis. He borrowed $2000 from Bennie McGovern to be used as cash bond; that he remembered the date because he had been held up the night before in a poker game and had only paid the note for $2000 about two weeks before he testified.

Neither Bernie nor Earl Shelton testified. Carl denied any participation in the robbery. He testified that he was never shot in the leg; that on the 30th or 31st of August he was shot in the arm; that he was treated by Dr. Black, of Herrin; that he never at any time discussed plans with Newman for robbing the bank; that he knew and was friendly with Newman, but did not know Summers and never saw him before he testified.

The credibility of Newman and Summers was further affected by the testimony of Floyd Arms and Paul Chapman, their fellow-convicts, who testified that Newman tried to persuade them to testify against the Sheltons in this case, promising an early release if they would do so. Arms testified that Newman in substance told him he was going to frame up on the Shelton boys; that he wanted Arms to make an affidavit that the Sheltons wanted Arms to knock Newman off; that Summers said to Arms that Newman

was trying to get Summers to testify against the Sheltons in connection with the Kincaid bank robbery, but that he did not know the Sheltons. Summers said, in substance, that Newman had said to him that he would like to have him testify that he went with the Sheltons on the job, but that it could not be done because Summers himself was then in the penitentiary or in jail. Newman asked Summers if he would sign an affidavit, and Summers said, "What about?" Newman said, "About the Kincaid bank robbery." Summers said, "You mean for me to sign an affidavit when I was in the penitentiary at the time?" Newman said, "I would if I had been up there," and Summers said, "I don't know anything. Art said, 'You don't have to know anything; do like I do.'" Newman and Summers on their cross-examination had denied these conversations with Arms and Chapman.

It is argued that the verdict was not supported by the evidence, the testimony of the witnesses tending to identify the plaintiffs in error as the persons committing the crime not being sufficient and the testimony of Newman and Summers not being worthy of belief. The identification of the defendants by the witnesses who testified to the circumstances attending the robbery is not convincing. Not one of them directly and positively identified any one of the defendants. Each of them qualified his testimony by the statement that he thought this was the man; that he would not say for sure but there were features that had a resemblance; he looked like one of these men, but he couldn't say he was the man; or similar expressions of doubt by the witness himself of the correctness of his identification. The burden rested upon the People not only to prove the commission of the crime beyond a reasonable doubt, but also to prove by the same measure of evidence that it was committed by the person accused or some or one of them, and a conviction cannot be said to be sustained by the evidence beyond a reasonable doubt where the testimony of

all the witnesses shows that their identification of the defendants is doubtful, vague and uncertain. A conviction of crime cannot rest upon probabilities alone, but the proof must be sufficient to remove all reasonable doubt that the defendants, and not somebody else, committed the crime, and it is not incumbent on the defendants to prove who did commit it. The other evidence tending to support the conviction is the testimony of the convicted felons, Newman and Summers. Their testimony is material and if given full credit is sufficient to sustain the verdict, but there are other questions yet to be considered in the record, and we shall therefore not now discuss the evidence at greater length.

After the verdict the defendants entered a motion for a new trial on the grounds, among others, that the court erred in permitting the witnesses Thomas Nave, Sudonna Bender and Fred Reiske to testify over the objections of the defendants, as the defendants had not been granted an opportunity to make any investigation of these witnesses or to prepare in any way to meet their testimony; that Fred Reiske testified falsely on the trial, as shown by his subsequent affidavit; that the defendants were not accorded a fair trial, because they were given no reasonable opportunity to obtain testimony to controvert the testimony of Mrs. Bender, whose name was endorsed on the indictment after the case was called for trial, and on the ground of newly discovered evidence. With the motion were presented a large number of affidavits.

Dr. J. T. Black, of Herrin, Illinois, stated that during 1924 he operated the Herrin Hospital, and on August 30 he treated Earl Shelton at the hospital for a bullet wound in his right leg, which entered the front of the leg below the knee and came out at the back of the leg, splintering the bone, and that later he gave three other treatments to the leg for the wound. Winnie Dudenbostel was head nurse at the Herrin Hospital from September, 1918, to March,

1925, and on August 30, 1924, she helped Dr. Black give medical and surgical aid and treatment to Earl Shelton by giving antitetanus serum and anæsthetic to Shelton, who was suffering from a gunshot wound in the right leg, below the knee; that she was present and saw Dr. Black treat Shelton for the wound on two or three later dates. Josie Goodrich stated that she was the book-keeper for the hospital on August 30, 1924, and made an entry on the record book showing the charges made for treatment given Earl Shelton on August 30, 1924.

The affidavit of Fred Reiske was filed, stating that his testimony that Earl Shelton came to affiant's shack at Horse Shoe Lake one night in September, 1924, and waited for a doctor, who later came and treated a bullet wound in Shelton's leg, was not true; that he was mistaken in saying that Shelton came to his house and had a bullet wound treated there; that he was persuaded to give such testimony by Hobart Summers; that Reiske had known Summers for a long time and Summers has been at Reiske's house at Horse Shoe Lake many times, and when he came to Taylorville Summers told him in the court house to testify as he did on the trial; that the Sheltons were no good and that Summers wanted to get rid of them. After leaving the witness stand he observed the Sheltons closely during a recess of the court when they were walking around the rooms behind the court room, and he now says that he never at any time in his life saw Earl, Carl or Bernie Shelton before the time he saw them while he was on the witness stand at the trial; that he told his friends on returning home that he had made a terrible mistake and did a great wrong by his testimony and desired to let the court know that his testimony was untrue, and he went voluntarily to the office of H. J. Bandy, attorney for the defendants, on January 11 and told him these facts and that he was willing to make an affidavit; that he had not seen either of the defendants since the trial and had never talked to

either of them. Reiske was subsequently produced and questioned in open court by the State's attorney, and in answer to questions stated that he was not persuaded and forced to the testimony given in court on the trial; that the State's attorney told him to tell the truth and that is all. He made a mistake and got the wrong man. Summers did not tell him that the Sheltons were no good and that he wanted to get rid of them, and he didn't tell anyone after he left that he made a mistake, until he saw Bandy. He did not tell Bandy that he wanted to tell the court that his testimony was untrue—only that he made a mistake. He did not read the affidavit, and the statements contained in it are not true. He never saw the defendants in the court house in Taylorville except when he was on the witness stand and never saw them walk around behind the court room. After he testified a car came to his house with several men in it, who said but few words to him. They said, calling him a vile name, "We are going to get you." Everyone had a gun on the floor of the car. He did not know who they were but he thought he had seen one before. This was about eleven o'clock the day before he went to Bandy's office. He had never done anything to those persons to cause them to want to kill him, and the first time he thought about making a mistake while testifying in Taylorville was when he started to Bandy's office.

Arley Rogers, of Christopher, in Franklin county, stated that on and prior to September 27, 1924, he worked at Tovey, in Christian county, and resided at Kincaid and boarded and roomed with Mrs. Bender, who appeared as a witness for the prosecution; that on September 27, 1924, Mrs. Bender operated a restaurant in Kincaid, approximately 150 or 200 feet from the Kincaid Trust and Savings Bank, on the opposite side of the street; that when the robbery occurred Rogers was in the restaurant in conversation with Mrs. Bender, and immediately before the shooting started, Goldie Mackaye, who was about eighteen years

old and was employed as a waitress in the restaurant, went out across the sidewalk in front of the restaurant to get some water, when the shooting started, and she immediately ran into the restaurant; that Rogers and Mrs. Bender were then engaged in conversation at the counter, and when Goldie ran back into the restaurant Mrs. Bender ran toward the door, apparently for the purpose of going out on the street to see what was going on, but she was not upon the public sidewalk or outside of the restaurant or in front of the restaurant at any time while the robbery was taking place or the shooting was going on and was never at any place where a person of normal vision could possibly see or identify any of the robbers. At that time Mrs. Bender was suffering with an affliction of her eyes, her vision was greatly impaired, she could see with great difficulty, and it was almost impossible for her to distinguish objects closely; that she would frequently stumble over chairs and other objects in the daytime because of her inability to see things.

The affidavit of Charles H. Nichols stated that he was a garage mechanic, residing in Springfield. In July, 1924, for about six months he and his partner, Robert Warrington, operated the Bulpit Garage, also known as the Nichols-Warrington Garage, at Bulpit, in Christian county. They were operating it all through the month of September. It was about a mile west from the Kincaid Trust and Savings Bank in Kincaid, and the towns are separated only by a road. The garage was in a northwesterly direction from the bank. Nichols knew Thomas Nave and where he lived at that time, a mile and a half south and a mile west of Kincaid. On a morning in September, 1924, the day of the robbery of the bank, Nichols and his partner were working in their garage on Nave's Ford coupe. Nave was there with them during the whole time they worked on it, from about ten o'clock to about eleven o'clock. While Nave was there and they were working on his car, about eleven o'clock or a little before, a man Nichols believed to be Pat Patter-

son came into the garage and told Nichols, Warrington and Nave about the robbery. It was the first any of them had heard about it, and the information was that it had happened just a few minutes before. Nave said nothing about having heard anything of it before, neither did he say anything about having seen anyone getting away from it. He had stopped at the garage for gasoline early in the morning, about 8:00 or 8:30, on his way over to Langley, and was on his way back when he stopped to have the work done on his car. Langley is east of Kincaid, between Kincaid and Taylorville. Nave made a remark which distinctly impressed the whole incident on Nichols' mind. The remark was, "Well, now Flesher [who was then sheriff of Christian county] will be out chasing the robbers and I can go and haul another load." When Nichols read in the newspapers about Nave's testimony on the trial he knew it was untrue and said so to some of his associates, and on Monday, January 16, Edmund Burke, one of the attorneys for the defendants, came to see him and he told him the facts.

Robert T. Warrington resides at Divernon, Illinois, and is employed at the Weaver Manufacturing Company's plant in Springfield. His affidavit was filed for the same purpose and to the same effect as Nichols' in regard to Nave's presence in the garage in Bulpit at the time the robbery was reported to have occurred, saying that Nave had been there about three-quarters of an hour, or longer, before they received the news.

It is within the sound legal discretion of the court to allow witnesses to be examined whose names are not endorsed on the indictment. Exercise of that discretion will not be reviewed unless it appears that the defendant had been taken by surprise, and the burden is on the defendant to show that he was surprised. (*People* v. *Strosnider*, 264 Ill. 434; *People* v. *Weil*, 243 id. 208; *Gifford* v. *People*, 148 id. 173; *Logg* v. *People*, 92 id. 598.) Notice to the defendant in a criminal prosecution of the witnesses to be

produced against him is intended for his protection by enabling him to prepare his defense against the accusation by these witnesses, and courts will see that this protection is afforded him. When the calling of other witnesses occasions no surprise and does not make any other preparation necessary to the defense, it has been said, there can be no good reason for withholding material or important testimony for the prosecution. A full and fair investigation is due to the public as well as the accused. A new trial can not be granted to enable the prosecution to bring forward any important testimony discovered after the commencement of the trial. Should injustice be likely to arise the witness may be refused; should it be done by his admission, a new trial might correct it. *Perry* v. *People,* 14 Ill. 496.

The testimony of Nave, of Mrs. Bender and of Reiske was material and important. The defendants had no notice that Nave would be called as a witness, his name was not mentioned until after the jury was sworn and the statements of the case by the prosecution and the defense made, and he was immediately examined as a witness. They were given notice of the witnesses Reiske and Mrs. Bender in the afternoon of January 3, after their motion for a continuance had been overruled. The case was immediately called for trial and the selection of a jury begun. The defendants had never heard of either of these witnesses. They had no opportunity to interview them or to prepare a defense against any accusation that might be presented through their testimony. The court in its discretion permitted them to be examined, but on the motion for a new trial the question is presented whether the defendants, under the circumstances, had a fair opportunity to make their defense. The evidence given for the prosecution by Newman and Summers was of a character which is always regarded as subject to grave suspicion. They were both, according to their testimony, accomplices in the crime. Not only were they in the class whose testimony is legally dis-

credited because of their conviction of felony, but they were self-confessed accomplices according to their testimony, whose evidence the jury could receive and act upon only with great caution. While their testimony must, as a matter of law, be received with suspicion and acted on with great caution it is nevertheless competent evidence, and a conviction of crime may be sustained on the uncorroborated testimony of an accomplice if it is of such a character as to convince the jury, beyond a reasonable doubt, of the guilt of the accused. In determining whether it is of such a character the jury should take into consideration all the facts and circumstances in the case. If their testimony is corroborated in material parts by respectable witnesses then the jury may take that fact into consideration in weighing the testimony of the accomplices and in determining to what extent the fact that the accomplice has testified truly in regard to some material matter justifies giving credit to other parts or all of his testimony. The record in this case contains no such material corroboration of the testimony of the accomplices. So far as the credibility of their testimony is concerned, it rests upon their naked statements. Whether the jury ought to have convicted on their uncorroborated testimony, or would have done so, we do not undertake to determine, but in view of the fact that their incriminating testimony is of this doubtful character it was very important for the defendants that no improper evidence should be introduced against them to give weight to the prosecution or that they should not be denied the opportunity to offer such countervailing evidence as they might be able to present. It is on this ground that in our judgment the court should have allowed the motion for ·a new trial. The defendant having the right to be informed of the witnesses against him in order that he may be prepared to meet their accusation, it is essential to fairness in the trial that the notice should be such that he be not taken by surprise and be given an opportunity to prepare to meet

such accusation. The State's attorney said in regard to Nave, when he asked leave to endorse his name after the statements had been made, that he was unable to state which of the defendants Nave would identify, because he had not talked to him. He did not say that he had not known of the fact that Nave could identify one of the defendants long before the trial. Mrs. Bender lived in Kincaid, and it seems hardly probable that the State's attorney did not know her or by reasonable effort might not have known of her knowledge of material facts. Reiske lived at a distance from the county in which the robbery occurred and the trial took place, and it might very easily be that the State's attorney would not be informed of his evidence until the trial. The witnesses were permitted to testify. The question now is whether the circumstances are such that the defendants were denied a fair trial because of their inability to prepare to meet the evidence of these witnesses. Nave is a farmer, and as appears by the affidavits of the defendants they had never heard of him before the notice was given that he would be put on the stand. There was, of course, no opportunity to prepare to meet his testimony. When his testimony was published two witnesses were promptly found to contradict him and to give testimony which, if true, showed that his testimony upon the trial was utterly wrong. Likewise there was no opportunity to prepare to defend against the evidence of Mrs. Bender, who attempted to identify all three of the defendants, but evidence was found soon after the trial which contradicted her testimony. An injustice was done to the defendants by permitting this evidence to be heard and considered by the jury without an opportunity to meet it. The case is not one for the application of the rule that where the defendants are clearly guilty and no other verdict could have been returned by the jury the judgment will not be reversed for errors on the trial. The evidence in this case was too close for the application of that rule. It cannot be said that if Nave had

not testified and Mrs. Bender had not testified, or if Nichols, Warrington and Rogers had testified as they stated in their affidavits, what the verdict would have been. We have no right to try the case on affidavits, but the jury should have had the opportunity to hear these witnesses, and the court erred in denying the motion for a new trial.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*