Argued October 10, 1961, affirmed January 5, 1962

# STATE OF OREGON *v.* O'DONNELL

367 P. 2d 445

*Thelma Chapman Fowler,* Eugene, argued the cause for appellant. With her on the brief was Jane A. Gearhart, Eugene.

*William F. Frye,* District Attorney, Eugene, argued the cause for respondent. With him on the brief was Kenneth A. Morrow, Deputy District Attorney, Eugene.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

PERRY, J.

The defendant, along with two others, was indicted by the Lane county grand jury for the crime of grand larceny. The indictment charged that:

> "The said Walter Frank Sanders, John Ambrose O'Donnell, and Harry Lee Smith on or about the 2nd day of May, 1960, in the County of Lane and State of Oregon, then and there being, and then and there acting together and in pursuance of a common intent, did then and there wilfully steal certain property, to wit: approximately Four

Thousand One Hundred Seventy-five Dollars and Twenty-four Cents ($4175.24) in lawful money of the United States, then and there being the property of Pay Less Drug Stores, Inc., a corporation, and then and there being of a value in excess of $75; contrary to the statute in such cases made and provided, and against the peace and dignity of the State of Oregon."

At his request defendant O'Donnell was tried separately. The jury returned a verdict of guilty and defendant appeals.

In establishing the crime of larceny and defendant's complicity therein the state relied upon circumstantial evidence. In order to consider the merits of defendant's assignments of error it is necessary to examine the evidence given at the trial. We therefore set out quite fully the significant facts.

During the early morning hours of May 2, 1960, Sergeant Larion of the Eugene Police Department observed an automobile with Montana license plates traveling very slowly in a southerly direction on Willamette Street in the city of Eugene. He was able to see that two men occupied the front seat and that they appeared to be looking intently at each side of the street as they drove. He followed the car for a few blocks and when it turned right onto Tenth Avenue he radioed to Officer Dirks that he should intercept it and investigate the occupants because they appeared suspicious. Larion last observed the vehicle as it was midway between Willamette and Olive Streets on Tenth Avenue.

When Officer Dirks first saw the car it was northbound on Olive Street and turning east on Seventh Avenue, still traveling very slowly. By the time he stopped it with his siren and red light, the vehicle

had turned south onto Willamette Street and was approximately at the location where Sergeant Larion had first observed it. Mr. Sanders got out and explained to Officer Dirks that he was going to the coast and had gotten off the main route. He was the driver and Smith was occupying the front seat with him. In the rear was defendant O'Donnell, apparently asleep, lying on a pile of coats which elevated him about one foot off the seat. Dirks asked the men for identification and O'Donnell furnished registration papers for the automobile.

After receiving certain information on his radio, the officer arrested Smith on a vagrancy charge and took him in his police car to the City Hall. Following along behind was the automobile containing Sanders and O'Donnell and behind that another police car driven by Officer Stedjskal, who had arrived on the scene just as Smith was being handcuffed. All three vehicles were parked in front of the City Hall. Dirks took Smith into the building. The others remained outside in their cars. Stedjskal departed on another call and O'Donnell and Sanders were left alone.

Approximately ten minutes later Sergeant Larion came out to question the two men. They were sitting in their automobile. He talked to Sanders first and asked him where they had come from. The latter stated that the three of them had driven from Billings, Montana, to the city of Yellowstone, had stopped there a couple of days and had then continued on through Prineville and over Highway 126 to Eugene. He said that they were en route to Coos Bay at the time. Upon being asked why they were driving around the downtown area Sanders re-

plied that they were short of money and were looking for a cheap hotel. The Sergeant then asked the same questions of defendant O'Donnell and was given the same information by him.

As the questioning progressed Sergeant Larion became more suspicious so he asked whether he might look through the car. Sanders said, "Sure, go ahead." The Sergeant noticed that O'Donnell was sitting in the rear seat and that next to him was a bunch of coats lying loosely in a pile, not packed down. Under the driver's seat he found a tear gas pen, loaded and cocked, together with an extra tear gas shell and in the trunk there were several tools lying on top of some luggage. Sergeant Larion then placed the men under arrest on charges of vagrancy and possession of burglary tools. He took the keys from their automobile and locked it and then transported them to the city jail in a police car. On the way he observed in the rearview mirror that O'Donnell rolled down the right window and placed his hand up to it several times as if he were throwing something out.

When they reached the jail Sanders and the defendant were booked and their clothing was taken from them. It was hung in a "dressing-in" room, which was under the supervision and constant observation of the jailor. Sergeant Lesiak of the Detective Division was present and he questioned defendant concerning his whereabouts and those of his companions during the previous evening. O'Donnell refused to discuss his whereabouts during the night but he did assert that he and his companions had been together at all times. Sergeant Larion returned to his patrol car. Upon opening the door he noticed an empty coin wrapper lying on the rear seat where O'Donnell had been sitting.

Larion went to the City Hall and there he and Officer Dirks made an extensive search of the defendant's car. Under and behind the dashboard they found a roll of paper currency totaling $394.00 and a five dollar roll of quarters. Inside the car they also found three pairs of gloves. In the trunk were the tools, including a splitting mall ax, a splitting wedge, brace and bit, hammer, hollow rod and a keyhole saw. All of these items were turned over to Officer Lockard, Identification Technician of the Eugene Police Department, and he locked them in the evidence room.

About 7:45 that morning Officer Greenough, who had just come on duty at the City Hall, noticed a red plastic diaper bag and a canvas bag lying on the pavement just a few feet from where the defendant's automobile had been parked a few hours before. On the plastic bag was a sales sticker from the Pay Less Drug Store and inside was a large quantity of rolled coins. There were some heavy tools in the canvas bag. He took the bags inside the building and gave them to Chief of Police Ellsworth. The latter turned them over to Officer Lockard, Sergeant Lesiak and Lieutenant Glenn. These men took the bags to the Identification Division in the jail building and there the contents were examined. The diaper bag was found to contain $1,283.46 and in the bag of tools there were three crowbars, two screw drivers and a pinch bar. One of the crowbars bore a coat of red paint and one of the screw drivers had a broken tip. The bag of money was taken by the officers a few hours later to the United States National Bank and left there for safekeeping. The bank teller placed a lock on the bag and gave its key to them along

with a receipt. The key was turned over to Chief Ellsworth who kept it in his possession until the trial.

At approximately 8:15 of the same morning, Mary Lyons, office clerk for the Pay Less Drug Store, arrived at her place of employment. She entered the front door of the store and went immediately upstairs to the office. There she saw a state of chaos. There was an abundance of fire clay all over the floor, the safe was pulled out from the wall, the filing cabinets were ajar and there were papers strewn all around. The safe was badly beaten and its door had been removed. A small safe which had been bolted inside the large safe was missing. Empty envelopes were lying about which she knew had contained money. She called the police.

Patrolman Perkins came to investigate, and across an alley from the rear of the store he found a small safe concealed from view behind a board. (This alley is within the area which was circled by defendant and his companions in their car between the times when they were first observed by Sergeant Larion and were stopped by Officer Dirks). Officer Lockard arrived. He took samples from the fireclay below the safe and also from a red paint smear which he found on the front of the safe door. On the floor he found part of a locking mechanism, two bolts and the tip from a screw driver and these he placed in his pocket. Then he went to inspect what Patrolman Perkins had found. The small safe was still locked. Its dial had been knocked off and there were two bolts missing from the door. Lockart inserted the bolts he had found and discovered that the threads matched perfectly. This safe was later opened and found to contain $4,410.77, the cash receipts of April 30 and May 1.

Mary Lyons computed that, in addition to this, an amount in excess of $1,481.00 had been taken from the large safe. Testimony at the trial revealed that after closing the store at 7:00 P. M. on May 1, pharmacist Guinn James had taken cash to the office and placed it in the safe. He had locked the small safe with the two days' receipts inside and had then locked the large outer safe. All had been in order when he left.

Around noon on May 2, Sergeant Lesiak went to the jailor and received from him the clothing which had been taken from Sanders. He gave it to Officer Lockard who delivered it the next day to Sergeant Prouty of the Oregon State Police crime laboratory. Lockard also gave Prouty the three crowbars from the canvas bag and the samples of fireclay and red paint which he had taken from the Pay Less safe. He kept the broken screw driver and the tip which he had found and he made detailed photographs of them which showed that the tip had originally been a part of that screw driver. He also tested the several tools for fingerprints of the prisoners but he discovered none.

Prouty found some fire clay in the cuffs of Sanders' trousers and placed it in a jar. He also took some paint from the red crowbar and placed that in a jar. Then, after running certain tests which revealed to him that there were no differences between the two samples of fire clay and the two samples of paint, he turned over all of the specimens to Thomas Matthews, an expert spectroscopist, for further testing. The latter found that the paint chips were all identical and had come from the same batch of paint and that the samples of fire clay were also identical and from the same source.

█ Most of the defendant's assignments of error rest on the contention that the exhibits offered in evidence were improperly received. His first contention is that there was no proof of the corpus delicti. The corpus delicti of the crime of larceny consists of two elements: (1) The property was lost by the owner, and (2) it was lost by a felonious taking. *Vaughn v. United States*, 272 F 451.

██ The evidence outlined above, without discussion, clearly discloses these facts: If it is defendant's contention that the exhibits were offered and received before proof of the corpus delicti was offered, then it appears, first, that most of the exhibits tended to establish the corpus delicti and, in any event, the order of proof rests in the judicial discretion of the trial judge and there is no showing of abuse of that discretion. *State v. Weston*, 102 Or 102, 201 P 1083.

█ The defendant's second contention is that the exhibits were erroneously admitted because they failed to connect the defendant with the commission of the crime. There is no merit in this contention.

The defendant was charged as a principal jointly with others. His statements are all to the effect that he was with these others during the time the crime was committed. He was also in the company of these same parties in his automobile at the time of his arrest.

While the physical evidence introduced tends to show that the companions of the defendant were the physical actors in the opening of the safe in the drug store, his admissions of his association with his companions and the use of his automobile unexplained leaves a reasonable inference that he conspired with

and aided and abetted in the commission of a crime which was consummated.

■ If a conclusion may be drawn that a party aided and abetted others in the commission of a crime, the extent of his participation is not material to sustain his conviction. *State v. Fichter,* 226 Or 526, 360 P2d 278.

■ The defendant also assigns error because the trial court admitted into evidence photographs of tools and other articles taken at the time of the arrest of the defendant. The basis of this assigned error is that while most of the articles shown in the photograph were properly admitted, the court excluded a pinch bar and screw driver shown in the photograph, apparently because there was no testimony that they were in the same condition as when taken from the defendant and his companions.

While most of the objects shown in the photographs were themselves admitted in evidence, the photographs were unnecessary to establish any "material fact or condition." *Godvig v. Lopez,* 185 Or 301, 202 P2d 935. Nevertheless, it does not appear to us that the defendant was harmed since there were properly offered and received other pinch bars, screw drivers, malls, saws, and other tools of the type used to commit burglaries taken from the accused and his companions.

The defendant did not ask the court to instruct the jury not to consider the pinch bar or screw driver shown in the photograph as evidence of burglary tools taken from the accused and his companions. The objection to the photograph upon that ground is not well taken.

■ The defendant also assigns as error the trial court's refusal to sustain his motion for a judgment of acquittal at the close of the state's case in chief. An examination of the evidence set out in this opinion fully discloses that there is no merit in this contention.

There are other assignments of error but they are so lacking in merit that they do not warrant discussion.

The defendant received a fair trial and the judgment is affirmed.