Argued February 4, affirmed April 8, petition for
rehearing denied September 9, 1964

# STATE OF OREGON *v.* CARCERANO

### 390 P. 2d 923

*Ralph E. Hillier,* Eugene, argued the cause and submitted the brief for appellant.

*William F. Frye,* District Attorney for Lane County, Eugene, argued the cause and submitted the brief for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Frank Anthony Carcerano, from a judgment of guilt and the ensuing sentence which the circuit court entered against him. The judgment is based upon the verdict of a jury. The crime which the indictment charged against the defendant and his three co-indictees was armed robbery as that crime is defined in ORS 163.280.

The material part of the indictment reads:

"The said Rex L. Craig, Marvin Domenic Castellano, Frank Anthony Carcerano, and Dean Reece on the 12th day of January, 1962, in the county aforesaid, then and there acting together and in pursuance of a common intent and being armed with

a dangerous weapon, to-wit, a .45 caliber pistol, did then and there assault Randall Haugen by pointing at, threatening and menacing the said Randall Haugen with said dangerous weapon, and thereby, and by putting in fear of force and violence, did rob, steal and take from the person of the said Randall Haugen $12,700 in United States money; contrary to * * *"

Randall Haugen, mentioned in the quoted language, was the assistant manager of the Safeway store in Junction City. The alleged robbery occurred in that store.

The defendant submits seven assignments of error.

The state contends that the defendant, on January 12, 1962, at 9 p.m., participated in an armed robbery of the Safeway store that is located in Junction City and that $12,700 was taken. According to the state, Rex L. Craig and Marvin Domenic Castellano, both of whom are named in the indictment, were the other participants. Craig, as a witness for the state, testified that after he had lived for ten years in Harrisburg, near Junction City, he went to Los Angeles in November of 1961 where he became acquainted with Carcerano, to whom we will refer as the defendant, and the other two indictees (Castellano and Reece). Continuing, he swore that about January 1, 1962, he and the other three men agreed to come north and rob the Junction City Safeway store. January 4 or 5 the four men drove to Junction City, so Craig testified, and three of them engaged a room there but he (Craig) continued on to Harrisburg where he visited with his wife. It was contemplated, so Craig swore, that later in the evening, at the conclusion of his visit with his wife, he should join the other three in their room and thereupon the four would go to the Safeway store and

rob it. Craig testified that he did not leave his wife that evening and did not join the other three until the following afternoon. When he tardily joined them he was severely castigated by Reece who emphasized his invectives with a display of his pistol which he twice discharged. Before long the four men drove back to Los Angeles. The robbery had not taken place.

Craig swore that January 11, one week after the trip north that we just described, he, the defendant and Castellano returned to Junction City. Their purpose was, so Craig swore, to rob the Junction City Safeway store. They planned to gain entrance in the manner that we will now describe. The three men, according to Craig, would lie in wait in a small shack close to the store until shortly before the hour (about 9 p.m.) when Haugen, the assistant manager, would turn off the store's lights and prepare to leave. Before that incident two of the indictees (the defendant and Craig) would leave the shack and stand beside Haugen's car which was parked close to the store's entrance. At the same time the third indictee (Castellano) would return to his automobile which was parked near by and serve as a lookout. The three agreed, so Craig swore, that when Haugen extinguished the lights and emerged from the door the defendant and Craig would rush upon him, force him to return into the store and admit the two. Craig testified that the plan was followed and that as a result he and the defendant gained entry into the store.

Haugen, as a witness for the state, testified that as he stepped from the store's doorway and was locking it two men rushed upon him and under the threat of their pistols forced him to return and admit them. Haugen and Craig described the manner in which the former, under the threat of the pistols, was forced to

open the store's safe. Both men, according to Haugen and Craig, wore stocking masks. Haugen testified that the physical features of one of the robbers compared "fairly close" to those of the defendant. He also swore that the defendant's voice was that of one of the two men who robbed the store. His words were, "As soon as I heard it, I remembered and recalled being back at the store that night—same fellow talking." The voice comparison was based upon Haugen's hearing of the defendant's voice (1) the night of the robbery and (2) in an incident which occurred in the courthouse about a week prior to the trial. Haugen estimated that the two robbers were in his presence about 15 minutes.

The two robbers had forced Haugen to lie upon the floor while the robbery was in progress and then bound his arms and legs with rope. The robbery occurred in the immediate vicinity of Haugen, but he could not see it because of a covering that was placed over his face.

Craig swore that he and the defendant left the store at the conclusion of the robbery and drove away in Haugen's car as they had planned to do. They were immediately followed by Castellano in his car. When they had gone a short distance the defendant and Craig, so the latter swore, abandoned Haugen's car, got into Castellano's and the three then drove to Portland. In Portland the three engaged space in a motel and made a partial division of the pillage. Then Craig and the defendant left by airplane for Los Angeles.

The defendant, who did not testify, presented only two witnesses. One was the attorney who represented Craig and the other was the district attorney. The defendant's purpose in calling those men was to make it appear that Craig had received a promise of a favor in exchange for his testimony. The district attorney

denied that any promise had been made and swore that no bargaining of any kind had occurred.

■ The first assignment of error is based upon the fact that the court ordered the defendant to arise while Haugen was testifying so that he could determine better whether the defendant was one of the robbers. The defendant contends that the judge's order for him to arise compelled him to testify against himself in violation of Article I, § 11, Constitution of Oregon. The trial lasted for four days and since the defendant was present every day, the jurors and others interested in the case had many opportunities to view him not only while he was seated near his counsel but also when he entered and departed from the court room. No claim is made that the defendant was directed to speak.

*State v. Black*, 150 Or 269, 42 P2d 171, 44 P2d 172, and *State v. Cram*, 176 Or 577, 160 P2d 283, ennunciated principles of law which signify that no error was committed by the ruling which directed the defendant to arise. The issue in the *Black* case was one of identity. The following quoted from it indicates the issue:

"* * * if the defendants had been in the court-room no right possessed by them would have been violated if their presence had been resorted to as a means of identification by the state's witnesses. For instance, in State v. Clark, 156 Wash 543 (287 P 18), the defendant was ordered, over his objection, to stand up and walk in front of the chair occupied by the prosecuting witness for purposes of identification."

The decision reviewed many others in addition to the Washington case which held in accord with the latter.

It quoted from *Holt v. United States*, 218 US 245, 31 S Ct 2, 54 L Ed 1021, 20 Ann Cas 1138 which held:

"But the prohibition of compelling a man in a

criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."

The *Cram* decision held that no illegal search occurred and that the defendant's constitutional right against self incrimination was not violated when, following his arrest, a sample of his blood was taken.

The court's order directed the defendant to do nothing except arise. Many of the authorities, in defining the right which is protected by the privilege against self incrimination (Oregon Constitution Art I, § 12), say that it is a right against testimonial compulsion. No testimonial compulsion was exacted from the defendant. Article I, § 12, Oregon Constitution, does not attempt to conceal from the jurors' eyes what is in their plain view, that is, the physical features of the accused. Both of the Oregon decisions, which we have mentioned, gave careful attention to the authorities. We remain satisfied with those decisions. The enactment of Oregon Laws 1961, Ch 713, § 1, page 1463, confirms our views. We are aware of no reason for reviewing the authorities again. This assignment of error is without merit.

The second assignment of error is based upon the denial of the defendant's motion for a dismissal of the indictment and upon the denial of a subsequent motion made by him for the return of a verdict of not guilty. The first of the two motions was submitted upon the conclusion of the state's case in chief, and the second was made when both sides had rested. Both motions presented these contentions:

1. The evidence in corroboration of the testi-

mony given by Craig, the accomplice, was insufficient;

2. The record presents a material variance inasmuch as the indictment "is brought against four named individuals" and the evidence fails to disclose participation on the part of Reece;

3. "The indictment is faulty and fails to allege the ownership of the money * * *."

4. "There is no proof that the property alleged to have been taken was taken from the person of the person so charging in the indictment, Randall Haugen";

5. "There has been no proof that the gun which is alleged to have been used in the commission of this robbery was capable of being fired."

ORS 136.550 provides that conviction cannot be had upon the testimony of an accomplice "unless it is corroborated by other evidence that tends to connect the defendant with the commission of the crime." Further, that section of our laws declares: "The corroboration is not sufficient if it merely shows the commission of the crime or the circumstances of the commission."

*State v. Haynes,* 120 Or 573, 253 P 7, states:

"The corroboration necessary to sustain the testimony of an accomplice need not go to the full extent of establishing the crime beyond a reasonable doubt wholly independent of the confederate's testimony. It is only necessary to corroborate him in material particulars. If the rule were otherwise, the testimony of the accomplice might as well be excluded as so much surplusage."

■ The needed corroboration may be supplied by circumstantial evidence, *State v. Duggan,* 215 Or 151, 333 P2d 907.

We have mentioned some of the evidence, which apart from Craig's testimony, indicates that this de-

fendant was an active participant in the commission of the crime. We noted that the assistant manager of the robbed store, upon seeing the defendant in the court-room, expressed a belief that his physical features compared "fairly close" with those of one of the robbers. About a week before the trial Haugen was called to the courthouse where he heard the defendant speak. As a witness he stated that the sound of the defendant's voice upon that occasion brought him "back at the store that night." He added "same fellow talking." An annotation in 70 ALR2d 1011 says:

> "The general rule, however, is that testimony identifying the accused by recognition of his voice is direct evidence."

At page 1012 the annotation says:

> "By the general rule, the weight of voice recognition testimony is a question of fact for the jury's determination."

*Small v. State*, 165 Neb 381, 85 NW2d 712, 70 ALR2d 984, which is the subject of the annotation from which we just quoted declared:

> "In Froding v. State, 125 Neb 322, 250 NW 91, it is held: 'Where an accused is identified by a witness solely from having heard his voice, the probative value of such evidence is a question for the jury.
>
> "'The positive testimony of one credible witness, identifying the defendants as perpetrators of the crime of robbery from the person, may be sufficient to support a conviction.'
>
> "The court went on to say: ' "That one may be identified by his voice is now generally held by the authorities. . . . Accordingly it has been held to be competent evidence to support a conviction, where a prosecuting witness identified the defendant solely by his voice, and where the witness

had never heard the defendant's voice but once before the commission of the crime, and that on the same day that the crime was committed, and then heard him speak only a few words." 8 RCL 184, § 176. See Mack v. State, 54 Fla. 55, 44 So 706, 13 LRA NS and note 373. * * *' "

We are aware of no reason for believing that a participant in a crime cannot be identified by one who saw the crime's commission, through his physical features, his attire, or his voice. If the alleged criminal was unusually short, tall, thin, overweight, or had a deformity, those features might attract attention. Voices differ and although the divergence between one voice and another may be slight, nevertheless, the person who receives a telephone call many times identifies the voice of the caller the moment it is heard. The sound of a voice, as it is broadcast by radio, may enable a listener to identify the speaker or singer.

■ We believe that Haugen's testimony which identified the defendant through his physical features and more particularly through his voice was competent testimony and that its weight was for the jury.

■ The evidence shows that the defendant was in close association with Craig and Castellano for more than a week before the commission of the crime and likewise in their companionship immediately before the crime was perpetrated. For example, Mary McNatt, who described herself as "a cocktail waitress and part-time bartender" of the Junction House near the Safeway store in Junction City, testified that on Friday, the 12th of January, the defendant, Craig, and Castellano were in the Junction House. The evidence indicates that the three entered the place at about 6 p.m. and remained there until about 8:30 of that same evening. Other evidence indicates that at about 8:30 p.m. they

went to a small shack near the Safeway store and remained there until they forced their way into the store. Mrs. McNatt had seen the three men and also Reece in the Junction House January 4 or 5.

Association of the kind described prior to the commission of the crime is deemed corroborative of an accomplice's testimony. *State v. Cain*, 231 Or 616, 373 P2d 1004; *State v. Wederski*, 230 Or 57, 368 P2d 393; and *State v. O'Donnell*, 229 Or 487, 367 P2d 445.

The defendant had enrolled some time prior to the commission of the crime in a course of study in Torrence, California. The records of the school show that he did not attend the class sessions January 4 and January 11. It will be remembered that according to Craig the defendant was in or around Junction City on those occasions. When the four men (the defendant, Craig, Castellano, and Reece) came to Eugene January 5, Craig did not stop in Eugene but went on to Harrisburg and visited his wife. According to evidence that did not come from Craig, three raincoats were purchased in a Eugene store January 5. Eugene is about 15 miles south of Junction City. After the crime's commission a raincoat of the exact type that was purchased by the three men was found wrapped around a duffel bag which contained—among other items—four guns. The bag had been placed in a hiding place near a road and was located for the officers by Craig. It is a reasonable deduction that the defendant was one of the three who purchased the raincoats.

There is other evidence apart from that given by Craig which connects the defendant with the commission of the crime. We do not deem it necessary to set it forth.

■ The second assignment of error also charges that proof is lacking that the property described in the

indictment "was taken from the person of" Randall Haugen. ORS 163.280 provides that the taking in the crime of armed robbery must be "from the person assaulted." The defendant argues that the evidence does not show that the money taken in this case was taken from "the person" of Haugen.

*State v. McCarthy*, 160 Or 196, 83 P2d 801, found no error in an instruction given to the jury in that case which read:

> "Robbery is the felonious taking of property from another by force. The personal possession of the property by the party robbed may be actual or constructive. If the property is in his presence and control, though not on his person, it is sufficient. * * *"

We take the following from *State v. Deso*, 110 Vt 1, 1 A2d 710:

> "The requirement of taking from the person as used in the statute is satisfied by a taking from the presence, as at common law. Com. v. Homer, 235 Mass. 526, 127 N.E. 517; Wood v. State, 98 Fla. 703, 124 So. 44; Crawford v. State, 90 Ga. 701, 17 S.E. 628, 35 Am.St. Rep. 242; People v. O'Hara, 332 Ill. 436, 163 N.E. 804; State v. Calhoun, 72 Iowa 432, 34 N.W. 194, 2 Am.St.Rep. 252; People v. Cabassa, 249 Mich. 543, 229 N.W. 442; Turner v. State, 1 Ohio St. 422; Hill v. State, 145 Ala. 58, 40 So. 654. A thing is in the presence of a person in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession. Com. v. Homer, supra."

*State v. Butler*, 27 NJ 560, 143 A2d 530, states:

> "* * * The phrase 'from the person * * * of another' has been broadly construed to include the taking of personalty from the custody of, or from the constructive possession of, or which is subject

to the protection of, another. State v. Grillo, 11 N.J. 173, 187, 93 A.2d 328 (1952); State v. Lyons, 70 N.J.L. 635, 645, 58 A. 398 (E. & A. 1904); People v. Kubish, 357 Ill. 531, 192 N.E. 543, 545 (Sup. Ct. 1934); People v. O'Hara, 332 Ill. 436, 163 N.E. 804 (Sup. Ct. 1928); O'Donnell v. People, 224 Ill. 218, 79 N.E. 639 (Sup. Ct. 1906); State v. Adams, 58 Kan. 365, 49 P 81 (Sup. Ct. 1897); State v. Craft, 299 Mo. 332, 253 S.W. 224, 227 (Sup. Ct. 1923); State v. Lamb, 242 Mo. 398, 146 S.W. 1169 (Sup. Ct. 1912); 77 C.J.S. Robbery, § 9. * * *"

*Barfield v. Texas*, 137 Tex Cr Rep 256, 129 SW2d 310, 123 ALR 1093, declares:

"* * * It clearly appears from the record that Jewett was employed by Harry Hurst and Jim Welsh, the managers of the Huston Labor Temple, as a porter and night watchman. His duties began at 7 p.m. and ended at 7 a.m., during which time he was in charge of the building and had the care, custody and control over it and its contents."

The court sustained the conviction of three individuals who entered the structure and stole the contents of its safe. It was held that the stolen property was taken from the person of Jewett. In so holding, the court said:

"* * * it was his duty to protect the property therein from theft and the like. He was more than a mere caretaker and porter whose only duty was to clean up. He was placed in actual control and possession of the building and its contents."

It will be recalled that Haugen was the assistant manager of the store, that he had the keys to the structure and had been entrusted with the combination to the safe. It was his duty, before going home, to see that the money was safely locked in the safe, that the doors were securely fastened, and that all precautions

against burglary had been faithfully carried out. These duties devolved upon him because he was the manager, and the establishment together with its contents was under his control. When he opened the safe for the robbers he did so only under the threat of their guns. When the money was taken, it and the robbers were in his immediate presence. The property would have been subject to his disposition if his arms and legs had not been bound by ropes, and if his life had not been threatened by guns. Haugen testified that before the two robbers left the store one of them reached into his pocket, took his billfold, removed its contents and then replaced the empty billfold in his pocket. That part of the loot was surely taken from Haugen's person.

■ The other contentions that form a part of the second assignment of error are not argued in the defendant-appellant's brief and no authorities are cited in their support. We assume that those contentions have been abandoned. We, nevertheless, considered them, but our analysis discovered no merit in those contentions.

It is our belief that the second assignment of error is without merit.

The third assignment of error is based upon four instructions requested by the defendant but not given. They undertook to define the degree of cogency that must be possessed by the evidence which the state claims corroborates the testimony given by Craig, the accomplice.

■■ The trial judge gave to the jury a comprehensive instruction delineating the cogency that evidence must possess to be deemed corroborative of that given by an accomplice. No exception was taken to that instruction and no criticism of it was voiced. Since we

deem that the trial judge's instruction was adequate, the mere fact that it was not couched in the language of the defendant's requested instructions is unimportant. We believe that this assignment of error is lacking in merit.

The fourth assignment of error is based upon the fact that the trial judge did not give to the jury an instruction requested by the defendant which read:

"* * * the State must prove to your satisfaction beyond a reasonable doubt that the money alleged in the Indictment to have been taken from Randall Haugen, if you find that any money was taken, was taken from the person of Randall Haugen."

We have already pointed out that for the purposes of robbery property is deemed taken from the person of the victim if it was within his reach, inspection, observation, disposition or control so that if his will power is not overcome by threats or violence he can dispose of it. The instruction stated to the jury that under our laws:

"* * * any person being armed with a dangerous weapon who assaults another and who robs, steals, or takes from the person assaulted any money or other property which may be the subject of larceny, shall be punished. * * * To rob is the felonious, violent taking of money, goods or other valuable things from the person or immediate presence of another by force or by intimidation."

We do not believe that this assignment of error discloses any merit.

The fifth assignment of error charges that the trial judge "erred in failing to instruct the jury as to lesser included offenses included in the indictment." The defendant concedes that he asked for no instruc-

tion to that effect. In the recent decision, *State v. Cain,* 230 Or 286, 369 P2d 769, which was based upon an indictment similar to the present one, this court, through Mr. Justice SLOAN, ruled:

"The last assignment complains that the judge failed to instruct on lesser charges. He was not requested to. Since the matter was not presented to the trial court we decline to decide whether the instructions would have been appropriate in this case. However, as above indicated, there was no denial that an armed robbery took place. It was only denied that defendant did it."

We abide by that ruling. The fifth assignment of error lacks merit.

The sixth assignment of error reads:

"The Court erred in failing to have defendant personally present at all portions of his trial * * *."

As authority for his contention that he was not present at all times during his trial, the defendant cites page 296 of the transcript of evidence where the court reporter made this entry: "Defendant not present in chambers during this particular discussion commencing on page 295, line 16."

Immediately before the trial had reached the stage mentioned by the entry on page 295 of the transcript the district attorney had announced that his next witness would be Mrs. Barbara Craig, the wife of the accomplice whom we have mentioned. At that juncture Judge Howell, the trial judge, upon his own motion, called a conference in his chambers to determine whether Mrs. Craig was a competent witness. The transcript of evidence at page 292 records that when the parties were in Judge Howell's chambers the following occurred:

"THE COURT: I want the record to show that

we are in chambers and that the defendant is personally present together with the district attorney and the defendant's counsel * * *."

No one challenged the accuracy of Judge Howell's statement. Upon entering his chambers a discussion occurred among the judge, the district attorney, and counsel for the defendant as to the competency of Mrs. Craig as a witness. The trial judge ruled that she was not a competent witness.

After Judge Howell concluded that Mrs. Craig was not a competent witness, the discussion ran on for a brief period. Apparently in that period the defendant left the judge's chambers. The subject matter of the discussion had changed from the competency of Mrs. Craig to testimony that had been given by Mrs. McNatt, the barmaid who worked in the Junction House. This discussion consisted of nothing but a short statement by Judge Howell of his recollection of Mrs. McNatt's testimony followed by an equally brief statement by defendant's counsel of his recollection of the same testimony. When the two had given their recollections they returned to the courtroom and the trial continued. Their recollections of Mrs. McNatt's testimony concerned only what she had said about the visit of the party of four to the Junction House January 4. It was largely concerned about a gun that Dean Reece displayed while seated in one of the booths at the Junction House. It did not pertain to anything that took place January 12 when three of the four conducted the robbery. It will be recalled that Reece did not participate in the robbery.

If Judge Howell, the district attorney, or the defendant's counsel noticed the defendant depart from the judge's chambers, no one mentioned that fact. Nor

did the court reporter mention it. The defendant's brief does not claim that anything material to the trial was said between Judge Howell and defendant's counsel during the short time that the defendant was absent from Judge Howell's chambers.

■ The principles of law portrayed in *State v. Kuhnhausen,* 201 Or 478, 544, 266 P2d 698, 272 P2d 225, 244, show that no right of the defendant was disregarded when Judge Howell, after ruling that Mrs. Craig could not testify, spent a minute or two outside of the defendant's presence in comparing with defendant's counsel his recollections of the testimony given by Mrs. McNatt.

■ A defendant should be present when something occurs concerning his case about which he could possibly take action or make a practical suggestion. As was said by Mr. Justice Cardozo in *Snyder v. Commonwealth of Mass.,* 291 US 97, 54 S Ct 330, 78 L Ed 674, 90 ALR 575:

> "Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence where presence would be useless, or the benefit but a shadow."

Assuming that the defendant was not present when Judge Howell and defendant's counsel, immediately prior to their re-entry of the courtroom, exchanged a few words about the testimony given by Mrs. McNatt concerning Dean Reece, the defendant could not have improved his chances of winning the case by being then present. They were talking about water that had passed over the dam. This assignment of error discloses no merit.

█ The seventh assignment of error, according to defendant's counsel, was included in defendant's brief only because the defendant insisted upon that course. This assignment of error reads:

"* * * there is no assurance that the transcript furnished by the court reporter is accurate."

As support for that statement the defendant submitted to this court the affidavit of a convict in the Oregon State Penitentiary in which the affiant stated that December 1, 1962, he wrongfully entered the automobile of the court reporter who served in the trial of this case and took from it, among other items, some shorthand notes which he destroyed. The affidavit says that the affiant engaged in the criminal act December 1, 1962. The trial of this case occurred in May 1962. The transcript of the proceedings is dated December 31, 1962. The record contains no evidence showing that any of the shorthand notes from the trial of this case were taken or destroyed. Judge Howell settled the transcript in this case May 10, 1963. His signature in settlement of the transcript rendered it prima facie correct: ORS 8.360 and 19.078. This assignment of error possesses no merit.

The above disposes of all contentions submitted by the defendant-appellant. The judgment of the circuit court is affirmed.