## Commonwealth *v.* Downer, Appellant.

Argued September 30, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Harry I. Glick*, with him *O. Hicks Friedman*, for appellant.

*Earle R. Jackson*, Assistant District Attorney, with him *Artemas C. Leslie*, District Attorney, for appellee.

OPINION BY ARNOLD, J., November 18, 1946:

The defendant was convicted upon indictments charging impersonation of a public officer;[1] blackmail or extortion[2] (two indictments); blackmail by accusation of a heinous crime;[3] and conspiracy with others to commit this last offense.[4]

On the afternoon of Sunday, July 2, 1944, at a bench in Schenley Park, Pittsburgh, John Doe, a stranger, engaged James J. Cosgrove in conversation and later invited him to his hotel room in downtown Pittsburgh. While they were in a toilet room a man (afterwards identified as Robertson) demanded that they come out. He showed them a police badge and threatened Cosgrove with trouble because, as he said, his companion, Doe, was a "bad man". Robertson ostensibly took Doe to jail but soon returned and told Cosgrove "they" wanted his fingerprints and picture. He then escorted Cosgrove to another hotel and obtained from him a full disclosure of his financial affairs, his savings and investments, and his standing in the community. Cosgrove reiterated that he had never been in any trouble, and that he did not want his reputation damaged by being mixed up in a police investigation. Robertson finally told him that the whole thing would be considered a "closed book", and allowed him to go. On July 5, 1944, Robertson came to the Mesta Machine Company plant where Cosgrove was working, had him called out, and told him that the inspector of police was angry because

---

[1] §319 of The Penal Code, 18 P.S. 4319.
[2] §802 of The Penal Code, 18 P.S. 4802.
[3] §803 of The Penal Code, 18 P.S. 4803.
[4] §302 of The Penal Code, 18 P.S. 4302.

he had not been brought in. They then met Downer, the present defendant, who, posing as the inspector of police, showed Cosgrove the headlines of a Pittsburgh newspaper which referred to the rape and slaying of a young girl in Pittsburgh, and said that Cosgrove was wanted for questioning about that crime. After other fear-producing statements, the defendant suggested that Cosgrove give cash bail of $5,000 in order that his good name be spared, and so that everything could be kept quiet; promising that the bail money would be returned in a few weeks. Robertson and Downer accompanied Cosgrove to two banks and waited while he withdrew money from each, and borrowed $2,000 additional from one of them. Cosgrove then gave some $5,000 to them. About six days later they tried to get Cosgrove to give them more money, alleging that "the judge said that the bail was not enough." At this point a confidant of Cosgrove sent him to the district attorney and the matter was turned over to the police. In November, 1944, after the examination of some 500 photographs in the rogues' gallery, Cosgrove identified the pictures of Robertson and of Downer. Through the aid of the Federal Bureau of Investigation, Downer was arrested in Denver, Colorado, and upon searching him the officers found a pair of handcuffs and a badge bearing the inscription "police detective." He was brought back to Pittsburgh and identified by Cosgrove. Robertson was not apprehended and John Doe was never identified. At the trial the bank officers were called, and testified to the loan and the two withdrawals of money on July 5, 1944.

The defense was a denial and an alibi. The defendant testified to where he had been living; that he had been residing in Houghton Lake, Michigan, on July 5, 1944, and for several days before and after; and that he had not been in Pittsburgh within ten years, i. e. since 1935.

Upon *cross-examination* the district attorney asked him: "Mr. Downer, why didn't you tell Mr. Sullivan

here [lieutenant of detectives in Pittsburgh] when you were turned over to him this story about being in Houghton Lake [Michigan, on July 5, 1944]?" Defendant's answer, over objection, was: "He never asked me where I was or anything else." The 5th assignment of error alleges that this was improper. Except for the provisions of the Act of 1911, P. L. 20, 19 P.S. 711,[5] where the defendant testifies in his own behalf he ceases to have the character of an accused and becomes a witness, subject to the same sort of cross-examination as any other witness, and great latitude on cross-examination is permitted (*Commonwealth v. Delfino*, 259 Pa. 272, 102 A. 949) ; he stands in no better position than any other witness (*Commonwealth v. Quaranta*, 295 Pa. 264, 145 A. 89) ; and there is no protection as to self-incrimination, it having been waived (*Commonwealth v. House*, 6 Pa. Superior Ct. 92; *Commonwealth v. Swartz*, 40 Pa. Superior Ct. 370). He may not limit the cross-examination only to the events concerning which he testified: Underhill's Criminal Evidence (3rd ed.) §114. Appellant argues that "the defendant was under no duty to speak." But the matter is not a question of duty. Frequently a witness testifying to an alibi is asked to name the person to whom he first related the events testified to. This is always competent. It is common experience that in all sorts of trials witnesses are asked to name the person to whom they first told that they had seen the acts or heard the matters to which they testified. In criminal trials the defendant's witnesses are usually asked why they did not report what they purported to hear or see to the police officers. Such cross-examination is proper and the admissibility does not depend upon any *duty* to speak or report to the police officers; but the fact that the witness did not,

---

[5] Under this Act, he cannot be interrogated as to prior convictions except under certain circumstances. Before the statute he could be so interrogated: *Commonwealth v. Racco*, 225 Pa. 113, 73 A. 1067.

may, in some degree, shed light on the believability of the testimony. The defendant quite properly cross-examined Cosgrove as to *his* not telling anyone his story until weeks later. The defendant taking the witness stand was in no different position. While under no *duty* to tell the police officer that he was in Houghton Lake, Michigan, on July 5, 1944, the jury might infer that the natural disposition of a person who had not been in Pittsburgh for ten years would be to state that fact, he having been arrested in Denver, Colorado, for a crime committed in Pittsburgh about July 5, 1944. Such cross-examination is no more harmful to a defendant than where, as in *Commonwealth v. Vallone,* 347 Pa. 419, 32 A. 2d 889, *the Commonwealth* was permitted to prove that a man under arrest remained silent when there was read to him a statement of the victim charging the defendant with the crime, and holding that the fact of his silence was a circumstance to be considered by the jury. The 5th assignment of error is overruled.

Assignments of error, 2, 3 and 4 are to the admission of evidence of the handcuffs and police badge found in the defendant's pocket when he was arrested in Denver, Colorado. The defendant was on trial for impersonating a police officer and for utilizing such impersonation to extort money, inter alia, by the accusation of a heinous crime. It is always relevant to show that the defendant when arrested had a firearm of the same caliber as a bullet found in the body of the deceased; that the defendant was possessed of a knife which could make the same kind of stabbing wounds as were found on the deceased; that the defendant had in his possession materials and instruments from which counterfeit money could be made (on an indictment for counterfeiting). See Underhill on Criminal Evidence, 3rd ed. §493, as to homicide cases. In the instant case the fact that the incriminatory objects were found on defendant's person some fifteen months after the crime might affect the weight of the evidence but not the admissibility. These assignments are overruled.

Coupled with the above offer it was proposed to show that the defendant when arrested was using an alias, or assumed name. The court sustained the defendant's objection, which was an error *against* the Commonwealth. With the hope that such errors may be avoided in other trials, we point out that evidence of the defendant concealing himself or fleeing, or using an assumed name after the commission of an offense, is relevant: *Commonwealth v. Luccitti*, 295 Pa. 190, 198, 145 A. 85; *Commonwealth v. Hadok*, 313 Pa. 110, 114, 169 A. 111; *Commonwealth v. Delfino*, 259 Pa. 272, 276, 102 A. 949; *Commonwealth v. McMahon*, 145 Pa. 413, 417, 22 A. 971; *Commonwealth v. Fusci*, 153 Pa. Superior Ct. 617, 35 A. 2d 93. To be admissible the flight need not occur immediately after the crime: *Commonwealth v. Liebowitz*, 143 Pa. Superior Ct. 75, 17 A. 2d 719; and Underhill on Criminal Evidence, 3rd ed. §201.

Assignments of error 1 and 6 raise the question that the evidence was so unbelievable, equivocal and insufficient that a new trial should be granted. As to whether the crimes charged in the indictments were committed by *some persons,* a reading of the evidence fully sustains an affirmative answer. The bank officers corroborated the withdrawal of the money, which Cosgrove swore he delivered to Downer and Robertson. That the statements made by Downer, Robertson and Doe were such that only a very credulous person would accept them, cannot make the evidence insufficient to sustain the finding. Always in blackmailing cases and "confidence games" the means used to victimize vary with the degree of gullibility of the victim. That the victim took as much line as the defendant fed out cannot benefit him.

On identification there was ample evidence, if believed by the jury. The victim identified pictures of Downer and Robertson, from 500 photographs shown him. When Downer was brought back from Denver he was again identified by Cosgrove as the person who had blackmailed him. Though Downer was alone when this

identification was made, this goes only to the weight thereof. The method of identification by placing a suspect in a group of other persons lends additional weight, but the fact that such was not done does not, exclude the evidence. The victim, Cosgrove, also identified Downer at the trial, and some corroboration was obtained from the handcuffs and police badge found in Downer's pocket when arrested.

The trial court in its opinion refusing a new trial stating "the evidence in this case was of the type which hardly would have convinced the trial judge beyond a reasonable doubt of Downer's guilt", is of no moment. In the first place, the test of whether the trial judge should grant a new trial is *not* whether he would have assented to the verdict if he were a juror. There is no requirement of the law that the Commonwealth must convince beyond a reasonable doubt *thirteen* jurors. If the court below felt that injustice was done, it would have granted a new trial. From an examination of the evidence we think that the refusal of a new trial was entirely correct. From the use of the word "hardly" we are asked to assume that that word was used in the sense of "not probably" or "not quite". The court, however, probably used the word in the sense of "barely". In any event, it is not the function of this court to construe the meaning of a word used in an opinion refusing a new trial.

There was error, however, in imposing sentence upon each of the five indictments.

In No. 257 March SS 1945, the indictment charged impersonation of a public officer under § 319 of The Penal Code. It will sustain a sentence.

In No. 269 March SS 1945, the charge, in two counts, is for extortion by accusation of a heinous crime. It will sustain one sentence on either of the counts, but not both, as the same crime is charged in variant form.

Nos. 267 and 268 March SS 1945, charge, under §802 of The Penal Code, the same offense in variant language: blackmail by injury to reputation. Ordinarily

a sentence could be imposed on either indictment. But the blackmail practiced on Cosgrove was by the accusation of a heinous crime (as charged in No. 269 March SS 1945), and there was no threatened injury to Cosgrove's reputation except such as flowed from the accusation, and no suggestion of obtaining money until *after* that accusation was made. Sentence may be imposed on No. 269 March SS 1945, but not on Nos. 267 and 268.

In No. 270 March SS 1945, the charge was conspiracy with Robertson and John Doe to commit a crime (blackmail by accusation of a heinous crime) charged in No. 269. This indictment will sustain a sentence, for the crime of conspiracy does not merge with the completed offense: *Commonwealth v. Corcoran & Corcoran*, 78 Pa. Superior Ct. 430.

The assignments of error are overruled except those relating to the several sentences, which are sustained. The sentence of the court of quarter sessions imposed on each indictment, to wit, No. 257, No. 267, No. 268, No. 269, and No. 270, is reversed and set aside, and the record is remitted to said court with direction to proceed to sentence the defendant anew in due form and according to law in Nos. 257, 269 and 270 March SS 1945.