**UNITED STATES** ex rel. **Theodore R. STOVALL, Appellant,**

v.

**Honorable Wilfred DENNO, as Warden of Sing Sing Prison, Ossining, New York, Appellee.**

**No. 307, Docket 29208.**

United States Court of Appeals Second Circuit.

Submitted en banc to this Court on May 26, 1965.

Argued Jan. 21, 1965.

Decided Jan. 31, 1966.

Friendly, Waterman and J. Joseph Smith, Circuit Judges, dissented.

Leon B. Polsky, New York City (Anthony F. Marra, The Legal Aid Society, New York City), for appellant.

Henry P. DeVine, Asst. Dist. Atty. (William Cahn, Dist. Atty., Nassau County, State of New York), for appellee.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and ANDERSON, Circuit Judges.

MOORE, Circuit Judge (with whom Judges KAUFMAN, HAYS and ANDERSON concur; Judge LUMBARD concurs in a separate opinion with which Judge KAUFMAN also concurs; Judge FRIENDLY dissents in a separate opinion with which Judge WATERMAN concurs; and Judge J. JOSEPH SMITH dissents in a separate opinion):

Theodore Roosevelt Stovall appeals from an order dismissing a writ of habeas corpus. The appeal was argued originally before a panel of this Court (Moore, Friendly and Marshall, C.JJ.), and an opinion was filed on March 31, 1965, reversing the order of the District Court, Moore, C.J., dissenting. Thereafter, this Court *sua sponte* on May 26, 1965, ordered *en banc* consideration of this case and six other cases. Upon such consideration, the order appealed from is affirmed.

Late on the night of August 23–24, 1961, Dr. Paul Behrendt was stabbed to death in the kitchen of his home in Garden City, Long Island. His wife, Dr. Frances Behrendt, vainly coming to his assistance, was grievously wounded. The police, who quickly arrived on the scene as the result of a telephone call for medical aid which Mrs. Behrendt had managed to make, found many pieces of telltale evidence. They discovered a key chain with three keys, one of which was to Stovall's locker in a Brooklyn store where he worked. They also found a bloody shirt with the identification tag of a laundry used by Stovall. Further investigation in the morning of August 24th led the police to a bar which Stovall had visited the previous night. This, in

turn, brought them to a man whom Stovall had called by telephone from the bar; he supplied Stovall's name and the address of Stovall's sister in Hempstead, Long Island. Proceeding to this address around 4:00 P.M., the police found Stovall and also Dr. Behrendt's blood-stained white coat. They arrested him and seized the coat, a pair of trousers owned by Stovall which were stained with blood of Mrs. Behrendt's blood type, and his pork-pie hat. The shirt left in the Behrendt kitchen was similarly stained, but a piece torn from it, found under Dr. Behrendt's armpit, was colored with blood of the Doctor's type. At the trial, Stovall's sister and a male friend of the sister testified that when Stovall came to her room in Hempstead at about 12:30 A.M., August 24th, he was not wearing the white shirt he had on earlier but instead appeared with the white jacket, bloody pants and a smear of blood on his forehead.

On the evening of August 24th, Stovall was questioned by the prosecutor at police headquarters; the statement was almost wholly exculpatory. The next morning he was arraigned, on a detective's charge of first degree murder, before a state district court judge. The judge informed Stovall, as required by § 188 of the New York Code of Criminal Procedure, "You have the right to the aid of a lawyer or counsel in every stage of the proceedings and before any further proceedings are had"; he then asked, "Do you want to get a lawyer?"; and said, "If you do, I'll give you time to get one before we proceed at this particular time." Stovall answered that he did, and on the Judge's further inquiry, "you're getting your own lawyer; is that right?", responded in the affirmative. The Judge then announced that he would "put it over to August 31st, next Thursday, for the purpose of getting an attorney," and directed that Stovall be "remanded pending further pleading."

Since Stovall had to remain in police custody pending further proceedings on the adjourned date, he was taken for identification purposes to Mrs. Behrendt's hospital room where Mrs. Behrendt identified Stovall as her attacker. Thereafter he was lodged in jail. Stovall was convicted by the jury of murder in the first degree. The jury did not recommend leniency. Stovall was, therefore, sentenced to death.

The principal point now urged on appeal is the claim (not even presented to the court below) that the taking of Stovall to Mrs. Behrendt's hospital room for possible identification violated his Fifth, Sixth and Fourteenth Amendment rights. No claim is made—nor could any be sustained by the proof—that Stovall's arrest was without probable cause or that there was any delay in his arraignment which occurred the morning following his arrest.

Nor is any claim made that Stovall at any time made a confession or gave any statements which were obtained by coercion, trickery or subterfuge—in fact there were no statements or confessions whatsoever. Thus, the only issue upon this appeal is: can the police, following an arraignment at which the person arraigned advised the court that he was going to get his own lawyer, continue their identification efforts by taking such person to the hospital room of the victim to ascertain whether or not she recognized him as her attacker? Obviously the victim of the crime, if he or she has had an opportunity to see the attacker at the time of the attack, is the person most likely to be able to confirm or refute the identity of the person arrested. Freedom or further detention may well come from a "yes" or "no" to the simple question: is this the man who attacked you?

### Fifth Amendment

#### (Self-Incrimination)

Appellant challenges the admissibility in evidence of Mrs. Behrendt's hospital room identification. However, under section 393-b, New York Code of Criminal Procedure, "a witness who has on a previous occasion identified such person

may testify to such previous identification."

■ What was Stovall's status at the time he was taken to Mrs. Behrendt's hospital room? Because of appellant's present argument, the spotlight of inquiry must be focused sharply upon this single period of time. Stovall had just been arraigned and had advised the court that he wished to obtain his own counsel rather than accept court-appointed counsel. To give him adequate opportunity to do so, the court adjourned "any further proceedings" for six days for that purpose. No plea was entered, no motions had to be made or waived, no rights were jeopardized. In the meantime Stovall had to remain in the custody of the police. This was lawful custody. To fulfill properly their duty to make sure that they had the right man, it was incumbent upon the police to have the victim of the assault view the suspected attacker to identify or disavow him as the culprit.

Had Mrs. Behrendt not been so seriously injured and hospitalized, Stovall would have been lodged in the local jail and Mrs. Behrendt could have viewed him in a line-up or looked at him through the door or gate of his cell. A photograph of Stovall might have been taken and exhibited to her. However, the police have to deal with situations as they find them and act expeditiously in the light of emergencies which confront them. Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room.[1] Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question.

■■ The hospital room identification[2] was not prejudicial to Stovall because Mrs. Behrendt, after she recovered, made positive identification in the courtroom. There is no evidence that her hospital room identification on August 25, 1961, affected or influenced in any way her courtroom identification on May 23, 1962. Any previous identification was but duplicative. She was the only living person who had seen her attacker. Stovall's counsel used his right of cross-examination to the fullest extent in questioning the identification and dwelt upon it in summation. Since the law requires the defendant to be present upon his trial and to exhibit his face for identification purposes, it was for the jury to weigh the accuracy of Mrs. Behrendt's identification.

■ As a matter of law, the method of identification inside or outside the courtroom would go to the weight to be attributed to the identification; not to the admissibility or constitutionality of testimony relating thereto, People v. Partram, 60 Cal.2d 378, 384 P.2d 1001 (1963), cert. denied, 377 U.S. 945, 84 S. Ct. 1353, 12 L.Ed.2d 308 (1964), (defendant forced to try on hat and coat which did not fit others in line-up); People v. Clark, 28 Ill.2d 423, 192 N.E.2d 851 (1963), (witness saw one of suspects in police station before line-up); People v. Boney, 28 Ill.2d 505, 192 N.E.2d 920 (1963), (wife raped; husband knew four of five in line-up were from State's Attorney office); State v. Hill, 193 Kan. 512, 394 P.2d 106 (1964); Redmon v. Commonwealth, 321 S.W.2d 397 (Ky.

1. Undoubtedly, if the police had failed to take Stovall to the hospital and had lodged him immediately in jail and Mrs. Behrendt had died, some appellate counsel would now be urging the same acts as a ground for reversal, asserting that he had thus been deprived of a constitutional right.

2. Voice identification was requested and Stovall complied but this form of identification was not used or referred to in the trial and, hence, is not an issue here.

1959), (claim that police pointed out suspect before line-up); Commonwealth v. Downer, 159 Pa.Super. 626, 49 A.2d 516 (1946), (defendant alone shown to witness), although there are some decisions to the contrary, People v. Conley, 275 App.Div. 743, 87 N.Y.S.2d 745 (1949), (defendant appeared alone and was forced to wear clothing corresponding to witness' earlier description); Johnson v. State, 44 Okl.Cr. 113, 279 P. 933 (1929) (only defendant produced).

Wigmore on Evidence, Vol. 8, 3d ed., § 2265, p. 374 has written:

"Looking back at the history of the privilege [against compelled self-incrimination] (ante, § 2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence."

\* \* \* \* \* \*

"In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in constitutional definitions, but *testimonial compulsion*." (Italics in original.) Thus

"an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, i. e., upon his testimonial responsibility."

\* \* \* \* \* \*

"What is obtained from the accused by such action is not testimony about his body, but his body itself (ante, § 1150). Unless some attempt is made to secure a communication, written or oral, upon which

reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one."

■■ The law has made and continues to make a definite distinction between testimonial evidence and identification. And for good reason. Physical characteristics such as facial features, color of hair and skin, height, weight and even manner of walk may be observed by all who may be present at the scene of a crime. A person does not become a witness against himself merely by possessing these individual characteristics. When it was discovered that the fingerprints of persons differed one from the other, this form of identification was added to the list of reliable distinguishing features which the police and the prosecution may, without violating the privilege, compel a defendant to reveal. Thus for generations it has been legal to require the accused to stand up in court for purposes of identification, State v. Carcerano, 238 Or. 208, 390 P.2d 923 (1964); People v. Oliveria, 127 Cal. 376, 59 P. 772 (1899). However, the opportunity for courtroom identification may well first be presented many months after the occurrence of the crime. Interests of the accused and society alike demand that this opportunity be afforded at the earliest possible moment. When this "moment" exists will of necessity be dependent upon the facts and circumstances of each particular case. No ironclad rules can be or should be laid down. But what better guides can there be than common sense?[3]

Helpful guides to decision may be found in other cases, which involved federal prosecutions. Most recently (September 9, 1965) the Court of Appeals

3. Kamisar, Criminal Justice in Our Time, Magna Charta Essays (University of Virginia Press 1965), pp. 9–10:

"Here misty ideals collide with the grim 'realities' of law enforcement. Here we are confronted, both with the Constitutional and normative levels, with the most important question, or cluster of questions, in the entire field of criminal procedure today.

"I am not talking about detention for such purposes as fingerprinting, placing in line-ups, confronting victims or witnesses and checking out alibis. Assuming the suspect has been lawfully arrested, such station house screening is both necessary and desirable."

for the District of Columbia had to deal with an identification after arrest problem (Kennedy v. United States, D.C.Cir., 353 F.2d 462). There police officers informed by radio of a crime arrived at the scene to find a man being forcibly restrained by two men who had heard womanly screams and had seen two men running from a house. The police took the man (Kennedy) into the house where they found two women handcuffed to a stair rail. The women identified Kennedy as one of their assailants. Upon the trial they identified the accused in open court and testified as to their prior identification even as did Mrs. Behrendt here. Upon appeal Kennedy's counsel urged that the complainants should not have been permitted to testify against him because the identification had derived (1) from an arrest without probable cause; (2) from an illegal detention; and (3) that his Sixth Amendment right to counsel had been infringed because he had been without counsel when identified at the scene of the robbery. The court found probable cause for the arrest and that "Appellant [Kennedy] made no confession and there is nothing to suggest a police purpose to elicit a confession." The court noted, after finding that there was probable cause for the arrest, that it is a policeman's "function to try to minimize the incidence of erroneous detentions and charges; taking Appellant into the presence of the complaining witnesses was entirely appropriate. Had the officers not done this Appellant would have been subjected to continued detention, a trip to the station, to booking and lineup processes, unnecessarily if the complainants had said he was not one of the attackers. The police should not have overlooked the possibility of his exoneration, which could be easily and swiftly resolved by 'quick verification' in a confrontation." 353 F.2d 462.

In Copeland v. United States, 343 F.2d 287 (D.C.Cir. 1965), the appellant after arrest was taken by the police to the Western Union office where the robbery had occurred to be identified by one of the victims. Then taken to the police station, he was identified there by a victim of a different and previous robbery. The conviction was affirmed.

In Caldwell v. United States, 338 F.2d 385 (8 Cir. 1964), the accused had been put in a line-up and identified by eyewitnesses. The court held that there was no self-incrimination, saying at p. 389: "The mere viewing of a suspect under arrest by eyewitnesses does not violate his constitutional privilege because the prisoner is not required to be an unwilling witness against himself. There is a distinction between bodily view and requiring an accused to testify against himself." And in People v. Gardner, 144 N.Y. 119, 128, 38 N.E. 1003, 1005, 28 L.R.A. 699 (1894) the New York Court of Appeals said: "A murderer may be forcibly taken before his dying victim for identification, and the dying declarations of his victim may then be proved upon his trial for his identification."

■ The principle that an arrested person "may be exhibited for identification to the person injured by the commission of the crime," Downs v. Swann, 111 Md. 53, 61, 73 A. 653, 655, 23 L.R.A., N.S., 739 (1909) is so consistent with fundamental fairness both to the accused and society that there is little point in further elaboration except to take notice that the law sanctions many methods of identification which do not invade the field of testimonial compulsion such as the use of fingerprints and photographs, including photographs of body scars. See Bartletta v. McFeeley, 107 N.J.Eq. 141, 152 A. 17 (1930); People v. Smith, 142 Cal.App.2d 287, 298 P.2d 540 (1956); State v. Emerson, 266 Minn. 217, 221, 123 N.W.2d 382 (1963); O'Brien v. State, 125 Ind. 38, 25 N.E. 137, 9 L.R.A. 323 (1890).

■ The accused may even be forced to perform some physical act such as putting on eyeglasses, People v. Tomaszek, 54 Ill.App.2d 254, 204 N.E.2d 30 (1964); submitting to a physical examination, McFarland v. United States, 80

U.S.App.D.C. 196, 150 F.2d 593 (1945); having a handkerchief put over his face to simulate his appearance at the time of the robbery, see Ross v. State, 204 Ind. 281, 182 N.E. 865 (1932) and Key v. State, 33 Okl.Cr. 92, 242 P. 582 (1925); or giving a blood sample. See also Walton v. City of Roanoke, 204 Va. 678, 133 S.E.2d 315 (1963). In summary, as Mr. Justice Holmes said in Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), the prohibition of the Fifth Amendment "is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material" (at 252, 31 S.Ct. at 6).

### Fourteenth Amendment

#### (Due Process)

Since courtroom identification, which usually takes place many months after the occurrence of the crime, is permissible, interests of the accused and society alike demand that the opportunity to identify be afforded at the earliest possible moment when the likelihood of an accurate identification is greatest. Of course, in the interests of truth and fairness to the suspect, this opportunity should be afforded, where possible, under circumstances most likely to lead to a disinterested decision by the identifier. When a proper moment exists will of necessity be dependent upon the facts and circumstances of each particular case. No ironclad rules can be or should be laid down. Although federal courts should be loath to interfere with state court evidentiary matters which go primarily to the weight of evidence admitted, it may be that an identification procedure could be so unfair as to amount to a violation of the Fourteenth Amendment's due process guarantee.

Here, however, defendant was not deprived of due process. A line-up was out of the question; a show-up could be conducted only where Mrs. Behrendt was then confined—the hospital. She had had more than a fleeting glimpse of the attacker. Although stabbed many times, she was not unconscious and the attacker had remained in full view in the brightly lighted kitchen for a considerable period of time after killing Dr. Behrendt and stabbing her. Upon the trial, there was no limitation to the cross-examination directed towards the weight of her hospital identification testimony. There is no basis for holding that Stovall was not accorded due process on his trial by the State of New York or that he was deprived of Fourteenth Amendment rights.

### Sixth Amendment

#### (Right to Counsel)

Appellant's counsel now argues that at the time of arraignment "his [appellant's] constitutional right to counsel had come into being and that failure of the arraigning Magistrate to adequately advise the defendant resulted in the denial of the right." The charge of failure of duty against a judge warrants factual investigation. When Stovall was brought before the Magistrate on August 25th, he was advised of his right to counsel and was asked whether he had counsel or desired to secure his own counsel. He replied that he did so desire. To give him this opportunity, the Magistrate adjourned further proceedings until August 31st. On that day [August 31st], Stovall informed the Magistrate, in response to the question as to whether Stovall had obtained counsel, that he had not communicated with any relatives to see if they would get a lawyer for him, but that he had been told in the jail that "they" said one would be assigned. The Magistrate then again told Stovall of his rights, "the first of which is the right to the aid of a lawyer." Turning to a well-known criminal defense lawyer, the Magistrate asked, "Counsel George Mulry, would you be willing to help this man protect his rights in this Court at this time?" Counsel agreed. The court told Stovall to confer with him and that "He is a lawyer who will volunteer his services to help you now protect your rights." A short re-

cess was declared after which, through counsel, Stovall demanded a hearing which the court set for the following day "so you [Stovall] could be confronted with the witness and the judge could decide whether or not a crime had been committed." However, on August 31st, Stovall was indicted for first degree murder by the grand jury and the case thereafter came under the jurisdiction of the County Court.

The New York Code of Criminal Procedure § 188 provides that the Magistrate inform the prisoner of "his right to the aid of counsel in every stage of the proceedings, and before any further proceedings are had." He must "allow the defendant a reasonable time to send for counsel, and adjourn the examination for that purpose." Id. § 189. The Magistrate followed this statute punctiliously. In the light of this record, the charge of failure to advise is completely unsupported by, and quite contrary to, the facts.

▮ Appellant's reference (in his brief) to his situation as amounting to "the release of the accused to his accusers," is equally unwarranted. Stovall was not so released; he had been arrested by the police; was in their custody; and, because of his expression of desire to obtain his own counsel, would remain in their custody until further proceedings were held. While in such custody, the police could have brought in any potential witness for identification purposes, including the victim, except for the fact that she, seriously injured, could not be moved from the hospital room. The only variation because of the necessity of the situation was the hospital room identification instead of a police station identification.

The record completely refutes appellant's statement (in brief) that "from this denial of right [to counsel] (a premise which may be mildly described as inaccurate) the *prosecutor* was enabled to *create* evidence used to secure conviction at the subsequent trial" (italics in original). There was no denial of the right to counsel; the Magistrate in fact honored Stovall's request that he be permitted to obtain his own attorney. Nor did the continuation of police efforts to secure the best evidence of identification before Stovall had an opportunity to engage his own counsel result in any incriminating statements or confessions because he made none.

If Stovall had had counsel, what could counsel have done to thwart the identification? He could not have demanded Stovall's immediate release so that no one might see him. He could not have arranged to have Stovall continuously wear a hood or mask over his face to avoid identification, nor could he have ordered the police forthwith to halt their identification activities. Counsel would not have said "Cease further efforts at identification; Stovall has admitted his guilt" because Stovall had not done so.

Again adverting to the opinion in Kennedy, supra, counsel could not have prevented the hospital room identification because "An accused has no right to be viewed in a line-up rather than singly." Here, as in Kennedy, counsel could not "have altered the course of events" as to identification, and since no confession or "any other evidence respecting which counsel could have rightfully advised Appellant to refuse to yield" was obtained, there was no deprivation of Sixth Amendment rights.

Lastly, appellant contends that he was denied a constitutionally adequate hearing on his motion to suppress. In the New York Court of Appeals to which an appeal from Stovall's conviction had been taken, the remittitur was amended to show that that Court had passed upon the contention that he had been convicted on evidence obtained by unlawful search and seizure. The Court held that his constitutional rights had not been violated (People v. Stovall, 13 N.Y.2d 1178, 248 N.Y.S.2d 56, 197 N.E.2d 543).

▮ The District Court was well aware of the arguments appellant now makes but found that the articles claimed to have been illegally seized, namely,

a white jacket, a pair of trousers and a hat, were not offered in evidence against Stovall by the People but were marked for identification by the defense. This action was entirely voluntary and must be attributed to defense strategy rather than a checkmate move because the District Attorney had announced at the opening of the trial that he would offer no items obtained from the allegedly illegal search. Nor could the "poison fruit" doctrine have led to the arrest because there was more than ample evidence to establish an earlier and independent source of information. Furthermore, since, as the Court found, "The proof is convincing that the articles were voluntarily turned over to the police by the sister of Stovall" and were not used by the People, the conclusion that "The record establishes that no constitutional rights of defendant were violated" is sound.

 Although a capital case requires the most careful scrutiny, these requirements have been met. The highest court of New York has reviewed his case (13 N.Y.2d 1094, 246 N.Y.S.2d 410, 196 N.E. 2d 65); the District Court considered and weighed the errors complained of, as has this Court. Upon the law and the facts, no infringement of any constitutional right is presented.

Affirmed.

LUMBARD, Chief Judge (with whom Judge KAUFMAN concurs), concurring:

I concur.

I agree with my brother Moore that the hospital room show-up did not violate any of Stovall's constitutional rights. The police found Mrs. Behrendt grievously wounded and in a state of severe shock at about 1:00 A.M. on August 24. At that time, in an incomplete and somewhat confused statement made to a police officer before she was given medical treatment, Mrs. Behrendt indicated that she had seen her attacker. The police were not allowed to interview Mrs. Behrendt on August 24, the day of her extensive surgery, or to present Stovall to her for identification purposes. They were therefore fully justified in continuing their investigation by bringing Stovall to the hospital at 1:00 P.M. on August 25, after Stovall's morning arraignment.

The type of emergency facing the police is relevant to the question of whether the show-up procedure was so unfair as to amount to a denial of due process. I agree with my brother Moore that the method of an identification normally goes to the weight of the evidence. Given the circumstances surrounding the identification, the full opportunity afforded defense counsel to cross-examine Mrs. Behrendt at trial, and the positive court room identification made by Mrs. Behrendt, I find no violation of Stovall's right to due process. Likewise, Stovall's Sixth Amendment right to counsel argument has no merit, particularly since counsel could have had little or no effect on what took place in the hospital room.[1]

1. Indeed, I wonder whether the right to counsel doctrines of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 apply to circumstances which do not ultimately involve a danger of self-incrimination. A person lawfully arrested and detained has no right to have his lawyer present to supervise all his activities that come within the realm of prison or detention house administration. Likewise, I should think that the police can search the defendant and his effects in the absence of counsel. Only when police conduct threatens to violate a personal right of the defendant that retains vitality during detention—e.g., the privilege against self-incrimination—or when police practices unfairly prevent the defense attorney from preparing his case—a literal deprivation of the right to counsel—must a court interfere to guarantee that the right is properly preserved. Viewed in this light, common sense finds a clear distinction between the case supposed by Judge Friendly in his dissent, where counsel is excluded from a court room identification at trial, and the failure to appoint counsel to accompany an accused to a pre-trial identification. Cf. United States v. Cone, 354 F.2d 119, n. 13 (2 Cir. 1965).

And I agree with the majority's disposition of the Fifth Amendment claim.

Unlike my brother Friendly, I see no need to inquire into whether the police violated New York law when they failed to deliver Stovall to a sheriff immediately after arraignment. Whether or not there may have been a technical violation of New York law is no grounds for reversal here. No objection was made to this procedure at trial. Therefore there was no need for the court to inquire into whether it was proper and appropriate for the police to retain custody of Stovall following his production before the district court judge. Nor is there a federal constitutional right to be committed to a sheriff rather than to the police pending arraignment. Since there was no due process violation in the hospital room identification, the police procedure violated none of Stovall's federal rights.

I differ with my brother Moore's discussion of the prejudicial error issue, although I agree that the use made of the hospital room identification at Stovall's trial did not amount to prejudicial error even if that identification procedure itself violated Stovall's rights.

The Supreme Court has prescribed a rigorous standard of prejudicial error when dealing with police activities that violate fundamental constitutional rights. See, e. g., Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171, (1963); United States v. Guerra, 334 F. 2d 138, 143–147, (2 Cir.), cert. denied, 379 U.S. 936, 85 S.Ct. 337, 13 L.Ed.2d 346 (1964). Assuming for the moment that the hospital room identification violated Stovall's constitutional rights, testimony as to that identification at trial was reversible error if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. State of Connecticut, 375 U.S. at 86–87, 84 S.Ct. at 230.

Mrs. Behrendt made a positive court room identification of Stovall, and she indicated that this identification was the product of her recollection of the night of the crime.[2] It seems highly probable that the use made of the hospital room procedure at trial did not influence this court room identification.[3] Under these circumstances, the impact of testimony

2. Relevant portions of Mrs. Behrendt's direct testimony are as follows:
 "Q. What did you observe or what did you hear from that point on? A. I saw he was tall and strong and medium color, a medium brown, and I saw his face clearly because I jumped at him head on, and then a moment later when he stabbed me I fell down and I was already on the floor when my husband—when I saw my husband dead * * *
 "Q. Now, this man that you speak of, that you saw, did you ever see him before that night? A. No.
 "Q. Have you ever seen him since? A. Yes.
 "Q. Are you able to point out who he is? A. Yes.
 "Q. Will you do so? A. This Negro sitting there (indicating).
 "The Court: Indicating the defendant.
 "A. (Continuing) In the light coat.
 "The Court: Indicating the defendant.
 "The Witness: What?
 "The Court: Indicating the defendant, you say?
 "The Witness: Yes.
 "Q. Did you ever see him anywheres before you saw him here in court today? A. Yes, in the hospital.

"Q. Do you know who he was accompanied by at that time? A. By several detectives, I think.
 "Q. Do you know approximately when this was with relation to the time that you went into the hospital? A. I'm not quite sure. It was a few days after the operation when I was fully conscious. [It was in fact one day.]"
 This was the only reference in Mrs. Behrendt's testimony to the hospital room identification until defense counsel's thorough cross-examination on that subject.

3. Mrs. Behrendt testified that she had not seen Stovall since the hospital room identification. Likewise, the prosecutor in his opening statement mentioned the existence of the hospital room incident but he said that he could only speculate as to whether Mrs. Behrendt would be able to make a court room identification. Since Mrs. Behrendt was excluded from the court room (as a witness) when the incident was brought out during the cross-examination of two policemen, and since no mention was made of it during her direct testimony until after her court room identification, it seems doubtful that the use made of the hospital incident at trial colored her court room identification.

as to the hospital room incident was cumulative.

Nevertheless, there remains the possibility that Mrs. Behrendt's ability reliably to identify Stovall at trial was in fact psychologically colored by the impact of the previous confrontation in the hospital room. This "prejudice" does not depend upon whether there was testimony as to the hospital room identification. And the only way to eliminate this aspect of prejudice would have been to exclude the hospital room identification *and* to prohibit Mrs. Behrendt from making any identification at trial. I am unwilling to hold that so broad an exclusionary rule should flow from a constitutionally infirm pre-trial identification because the likelihood that an unbiased court room identification can still be made seems great and because eye witness evidence, despite its human frailties, plays a vital role in criminal prosecutions. I am particularly unwilling to exclude all identification in this case because Mrs. Behrendt's testimony seems reliable and because the alleged police improprieties were unintentional and technical. It was proper to admit this evidence and to allow the jury to weigh its reliability.

If Mrs. Behrendt should be permitted to make a court room identification, then use of the hospital room identification becomes cumulative and harmless. More significantly, it is *fairer* to Stovall to *permit* testimony and full cross-examination concerning the hospital room procedure because only then can the jury know that the unequivocal court room identification may be the product of previous police persuasion rather than an accurate recollection of the night of the crime. At Stovall's trial, these considerations are evident: outside of the prosecutor's opening address, the first mention of the hospital incident came during the cross-examination of two policemen who accompanied Stovall to the hospital. And defense counsel concentrated heavily on this incident in his cross-examination of Mrs. Behrendt while the prosecutor only brought it out casually. Consequently, I conclude on the facts of this case that the use made of the hospital room identification not only was harmless error but indeed was the fairest method of handling Stovall's trial.

FRIENDLY, Circuit Judge, with whom WATERMAN, Circuit Judge, joins (dissenting):

The facts giving rise to the issue here [1] were stated as follows in the panel opinion of March 31, 1965:

Section 192 of New York's Code of Criminal Procedure prescribes, so far as here pertinent, that "If an adjournment be had for any cause, the magistrate must commit the defendant for examination," and § 193 adds that the commitment shall be to the sheriff, save in New York City where it is to be to the commissioner of correction. We were told at the argument that the sheriff of Nassau County does not have a representative available in the arraigning courts and that responsibility for placing committed defendants in his hands rests with the police. After the arraignment but apparently before Stovall was handed over to the sheriff, two detectives took him, handcuffed to one of them, to the hospital where Mrs. Behrendt had undergone extensive surgery, and into her room. Three high police officers and two prosecutors were also there. One of the police officers asked Mrs. Behrendt whether Stovall was "the man"; she said he was.

---

1. The statement of the majority that this claim was "not even presented to the court below" is not wholly accurate. As the panel opinion explained, it was raised in Stovall's hand-written petition but was not considered by Judge Wyatt since in the district court counsel had relied entirely on the point dealt with in the final paragraphs of this court's opinion. The panel opinion also noted that the Assistant District Attorney commendably had not relied on the failure of Stovall's counsel to argue the point to Judge Wyatt and sought disposition by us on the merits.

At some time one of the officers asked Stovall "to say a few words for voice identification"; he did—just what does not appear.

The panel recognized that "the privilege [of the Fifth Amendment against self-incrimination] does not invest a defendant with immunity from exposing himself to identification, even if this includes some movement, such as going from the jail to the courtroom for trial or rising, if called upon * * * and it may well be argued that use of the vocal chords, when these are not employed to produce utterances of testimonial value, stands no differently from that of the arm muscles."[2] But this truism does not settle whether Stovall was deprived of his Sixth Amendment right to counsel; although the two rights often overlap, they are not congruent. No one would suppose, for example, that because the Fifth Amendment does not protect a defendant from being compelled to stand up in court and try on a garment found at the scene of the crime, the prosecutor could require defense counsel to absent himself during such an episode. It is beyond dispute that the preliminary hearing was part of a "criminal prosecution," that Stovall had become an "accused," and that he was thus entitled

"to have the Assistance of Counsel for his defence." Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed. 2d 114 (1961); White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963). This distinguishes Kennedy v. United States, 353 F.2d 462 (D.C.Cir. 1965), and other cases of identification during the investigative stage, on which the majority rely. I fail to understand why, in the interval between preliminary hearing and trial, a defendant is not entitled to the assistance of counsel when the state wishes to make use of him to obtain evidence that will have independent testimonial value—particularly when Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), has obliterated any distinction between judicial and extra-judicial action by the police once the "criminal prosecution" has begun.[3]

The majority say that after Stovall's appearance before the state judge he "had to remain in [police] custody" and that his custody was lawful. I see no basis for these statements. New York properly recognizes that, after the preliminary hearing, the prisoner comes under a new legal regime and his lawful custodian is the sheriff, not the police;

2. The reference to moving the arm muscles was followed by citation of Mr. Justice Holmes' well-known opinion in Holt v. United States, 218 U.S. 245, 252, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

3. I see no basis for Chief Judge Lumbard's "wonder whether the right to counsel doctrines of Escobedo v. Illinois and Massiah v. United States apply to circumstances which do not ultimately involve a danger of self-incrimination." Once it has been held, as these cases clearly did, that the Sixth Amendment may apply outside the courtroom and when, as in Massiah, the accused did not even know of the presence of the police or the prosecutor, I see no escape from the conclusion that, if the right has attached, the accused is entitled to the assistance of counsel when the prosecutor attempts to use him as a means of procuring evidence to be offered at the trial. I cannot believe my brothers would go

to the extent of saying that, after arraignment or indictment, counsel could be excluded while the defendant was being subjected to medical examination or blood or handwriting tests. If counsel cannot be excluded from such procedures, common sense does not supply me with a satisfactory answer why he can be barred from an identification which his client is compelled to attend—although no one would dream of excluding him from a less meaningful one in the courtroom; the argument that, although excluded from the former, he will have an opportunity to attack both identifications at trial, does not seem sufficient for preventing him from rendering all possible assistance to the accused before the witness' impression hardens. I fear that my brothers simply have not been able to adjust their sights to the Supreme Court's new concept that the right to the assistance of counsel embraces activities outside the courtroom.

the only thing the police could properly do with Stovall at that time, see § 193 of the New York Code of Criminal Procedure, was to place him in the hands of the custodial authorities just as soon as possible. Those authorities would have been bound not only to prevent Stovall from removing himself but also to prevent his being removed or molested by anyone else. The assumption, implicit in the court's opinion, that such a prisoner is suject to the beck and call of the police is surely wrong, see Judge Finletter's fine opinion in Commonwealth v. Brines, 29 Pa.Dist. 1091 (C.P.1920). Once Stovall was in the sheriff's custody, the latter could not lawfully release him to the police without an order of the court; if the prosecution had sought such an order, counsel could have been appointed and the difficulty that has here arisen would have been avoided.[4]

Other arguments advanced by the majority are equally unconvincing. They say the police could have taken Stovall to the hospital for identification before arraignment despite the absence of counsel, so why not thereafter? But many things can be done in the absence of counsel in the investigative stage before the "criminal prosecution" begins, which cannot lawfully be done later, as Massiah v. United States, supra, plainly shows. The rhetorical question as to what counsel could have done was answered in the panel opinion many months ago:

> He might have persuaded the prosecutor, in the state's own interest, if not to forego the hospital identification, at least to assure conditions better designed to avoid suggestion. He might have persuaded the judge to direct that Stovall be immediately sent to and then kept in jail pending trial, or be put before Mrs. Behrendt only under fair con-

ditions such as a line-up, or be accompanied by counsel who might question her * * *. Or, as a last resort, he might have advised Stovall to refuse to go, or to remain silent if taken by force.

The case thus bears no resemblance to the recent decision in Rigney v. Hendricks, 355 F.2d 710 (3 Cir. 1965), with which I am in accord, where counsel were notified of the intention to place an accused prisoner in a line-up held under scrupulously fair conditions and with counsel present. We have been told in no uncertain terms that, in dealing with a capital charge, as Stovall's was at the time, we are not to speculate on whether prejudice resulted from the absence of counsel, Hamilton v. State of Alabama, supra, 368 U.S. at 55, 82 S.Ct. 157, at 159, here, as there, "the degree of prejudice can never be known."

My brothers also intimate that the police and the prosecutor were confronted with an emergency and that they may have thought the visit to the hospital to be in Stovall's own interest. The latter argument ignores the huge amount of circumstantial identification the excellent police investigation had produced; moreover, if the state officials were motivated by such solicitude, the natural course would have been to ask Stovall whether he wanted to go. The emergency argument fails both on the facts and on the law. Grievous as Mrs. Behrendt's injuries had been, nothing in the record indicates that her life was any longer considered to be in peril when Stovall was brought before her; the presence of five police officers and prosecutors in her hospital room would argue to the contrary—and also tends to negate the suggestion that Stovall had to be brought in alone. If Mrs. Behrendt's condition had been as serious as my brothers suppose, nothing prevented the

---

4. It is unnecessary to decide in this case the manner and extent to which Stovall could have been exposed to viewing in the

course of normal jail routine. Cf. Morris v. Crumlish, 239 F.Supp. 498, 499 (E.D.Pa.1965).

prosecutor from informing the state district judge at the preliminary hearing that Stovall had to be taken immediately before her, and suggesting that counsel be assigned forthwith for the limited purpose of advising him in that regard—rather than standing silent when Stovall told the judge of his desire to have counsel and then carting him off to a confrontation by the victim which counsel might have done something to mitigate.

My brothers also assert that in any event admission of the hospital identification was cumulative and therefore not prejudicial to Stovall, although they do not altogether agree on the grounds. Addressing itself to this point the panel said:

> The statement was inculpatory on the central question of his presence on the occasion of the crime; indeed, Mrs. Behrendt's was the only identification that was testimonial rather than circumstantial, and the jury asked that all her testimony be reread. A claim of harmless error as to a conviction must surmount an exceedingly high hurdle, even on collateral attack, when the error was constitutional and the punishment is death. See Bruno v. United States, 308 U.S. 287 [60 S.Ct. 198, 84 L.Ed. 257] (1939); Kotteakos v. United States, 328 U.S. 750, 764–65 [66 S. Ct. 1239, 90 L.Ed. 1557] (1946); Stewart v. United States, 366 U.S. 1, 9–10 [81 S.Ct. 941, 6 L.Ed.2d 84] (1961); Hamilton v. State of Alabama, supra, 368 U.S. 52 [82 S.Ct. 157]. The hurdle is too high for this case.

Despite the labored attempt to prove the contrary, the hospital identification, featured in the prosecutor's opening, must have had a far greater effect on the jury than the identification in court some months later; common sense supports Dean Wigmore's observation, "After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity." 4 Evidence § 1130 at 208 (3d ed. 1940). The self-created dilemma of the concurring opinion, that exclusion of the hospital identification would prevent identification at the trial, is illusory; exclusion of the former would simply have required the prosecutor to rest on Mrs. Behrendt's memory of the night of the dreadful crime and on her courtroom identification. If, in this posture, defense counsel had brought out the hospital identification, as no experienced counsel would, he would have had only himself to blame.

Although there can assuredly be a waiver of the right to counsel between arraignment and trial, no one has seriously suggested that we could find that, when, without any previous discussion, this Negro, of low mental capacity, was taken to the hospital by a detective to whom he was handcuffed. I scarcely regard Stovall as a sympathetic character, and I am glad that the crime was recent enough to permit an effective retrial. But I continue to believe that, in the absence of overriding necessity or consent, a man who has been brought before a judge on a charge of a capital crime, and has expressed his desire for counsel, is entitled under the Constitution to be let alone until he gets one. That is all Judge Marshall and I decided last March, and I adhere to it.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. I agree with Judge Friendly that "in the absence of overriding necessity or consent, a man who has been brought before a judge on a charge of a capital crime, and has expressed his desire for counsel, is entitled under the Constitution to be let alone until he gets one."